521 F.2d 971
 8 ERC 1289, 172 U.S.App.D.C. 311, 6
Envtl. L. Rep. 20,007
 DISTRICT OF COLUMBIA, etc., Petitioner,
v.
Russell E. TRAIN, Administrator, Environmental Protection
Agency and Environmental Protection Agency, etc.,
Respondents,
Washington Area Bicyclist Association, Inc., Metropolitan
Washington Coalition for Clean Air, Inc.,
Breathers for the Reduction of
Atmospheric Hazards to the
Environment, Intervenors.
The COUNTY OF PRINCE WILLIAM, VIRGINIA, Petitioner,
v.
ENVIRONMENTAL PROTECTION AGENCY, Respondent.
STATE OF MARYLAND, Petitioner,
v.
Russell E. TRAIN, Administrator, and Environmental
Protection Agency, Respondent.
CITY OF FAIRFAX, VIRGINIA, a Municipal Corporation, Petitioner,
v.
Russell E. TRAIN, Administrator and Environmental Protection
Agency, Respondent.
CITY OF ALEXANDRIA, a Municipal Corporation of Virginia, Petitioner,
v.
Russell E. TRAIN, Administrator, and Environmental
Protection Agency, Respondents.
COMMONWEALTH OF VIRGINIA ex rel. STATE AIR POLLUTION CONTROL
BOARD, Petitioner,
v.
Russell E. TRAIN, Administrator and Environmental Protection
Agency, Respondent.
 Nos. 74-1013, 74-1575 and 74-1579 to 74-1582.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 12, 1975.
Decided Oct. 28, 1975.
 
 John C. Salyer, Asst. Corp. Counsel for the District of Columbia, Washington, D. C., with whom C. Francis Murphy, Corp. Counsel, Louis P. Robbins, Principal Asst. Corp. Counsel, and David Eisenberg, Asst. Corp. Counsel, Washington, D. C., were on the brief for petitioner in No. 74-1013.
 J. Thomas Steger, Asst. Atty. Gen., Commonwealth of Virginia for petitioner in No. 74-1582 also argued for petitioners in Nos. 74-1575, 74-1579, 74-1580 and 74-1581.
 John S. Battle, Jr., and William H. King, Jr., Richmond, Va., were on the brief for petitioner in No. 74-1575.
 Stephen M. Pratt, Fairfax, Va., was on the brief for petitioner in No. 74-1580. Thomas P. Dugan, Fairfax, Va., also entered an appearance for petitioner in No. 74-1580.
 J. Howard Middleton, Jr., Alexandria, Va., was on the brief for petitioner in No. 74-1581.
 Bruce J. Chasan, Atty., Dept. of Justice, with whom Wallace H. Johnson, Asst. Atty. Gen., Edmund B. Clark, Martin Green, Attys., Dept. of Justice, and Robert V. Zener, Gen. Counsel, E. P. A., were on the brief for respondent.
 Joel D. Joseph, Washington, D. C., for intervenors in Nos. 74-1013 and 74-1579.
 Before MacKINNON and ROBB, Circuit Judges, and CHRISTENSEN,* Senior United States District Judge for the District of Utah.
 Opinion for the court filed by Circuit Judge MacKINNON.
 MacKINNON, Circuit Judge:
 
 
 1
 The State of Maryland, the Commonwealth of Virginia, the District of Columbia, the County of Prince William, Virginia, and the Cities of Alexandria and Fairfax, Virginia, petition this court for review of the action by the Administrator of the Environmental Protection Agency (EPA) in promulgating "transportation control" regulations to be included in the air quality implementation plans for the National Capital Interstate Air Quality Control Region.[1] 38 Fed.Reg. 33702 (Dec. 6, 1973). These regulations were adopted pursuant to section 110 of the Clean Air Act, 42 U.S.C. § 1857c-5. We affirm the regulations in part and remand the remainder to the EPA for revision and further proceedings in light of this opinion.
 
 
 2
 I. Background.
 
 A. The Statutory Scheme
 
 3
 Under the regulatory scheme established by the Clean Air Act Amendments of 1970, 84 Stat. 1679, 42 U.S.C. § 1857 Et seq., the Administrator of the EPA was directed to promulgate national primary and secondary ambient air quality standards (section 109). The standards were promulgated at 36 Fed.Reg. 8186 (April 30, 1971). Each state[2] was then required to develop and submit for EPA approval by January 30, 1972, a plan for the implementation, maintenance and enforcement of these standards in each air quality control region within the state (section 110(a)(1)). The Administrator was directed to approve any state plan or portion thereof which satisfied the criteria enumerated in section 110(a)(2)(A)-(H) and disapprove the remainder.
 
 
 4
 If a state fails to submit a plan, submits an inadequate one, or fails to revise its plan when required, the Administrator is to publish proposed regulations which are to be promulgated as the implementation plan for the state within six months of the deadline for the state submission (section 110(c)). Thereafter the EPA-promulgated plan governs the regulation of air quality in that state. Under section 113, the EPA is authorized to enforce implementation plans through compliance orders, civil actions or criminal penalties. Although the statute calls for achieving the primary standard by May 31, 1975, it also provides for an extension of up to two years upon submission by the state of an application satisfying the requirements of section 110(e).
 
 
 5
 B. The Development of a Transportation Control Plan for the National Capital Region
 
 
 6
 Since automobile exhaust emissions are the chief source in the ambient air of three of the six pollutants for which standards were issued (40 CFR, Part 50), the Administrator determined that in some areas, transportation control plans would be necessary to reduce concentrations of carbon monoxide, hydrocarbons and photochemical oxidants to acceptable levels. However, because of the lack of experience with such plans, the deadline for the states to submit them was extended to February 15, 1973. 87 Fed.Reg. 10842 (May 31, 1972). For the same reason, many states were given two year extensions of the deadline for attainment of the primary standards. On January 31, 1973, this court decided NRDC v. EPA, 154 U.S.App.D.C. 384, 475 F.2d 968 (1973), which held that the Clean Air Act did not permit either delay in the submission of transportation control plans or the granting of blanket extensions of the attainment date of mid-1977. The states were accordingly directed to submit transportation control strategies by April 15, 1973, designed to attain the national air quality standards by mid-1975.[3]
 
 
 7
 The various governmental units comprising the National Capital Region created an Air Quality Planning Committee to formulate a coordinated transportation control plan. Its recommendations were largely followed by the District of Columbia, Maryland and Virginia in the plans they submitted to the EPA during April and May, 1973. The plans included proposals for improved mass transit, parking disincentives, emission inspection programs, vehicle retrofit, control of gasoline evaporation during transfer, elimination of dry cleaning vapor losses, a ban on truck deliveries during certain hours, and aircraft taxiing emissions reductions. They were designed to bring about a 56 percent reduction in carbon monoxide emissions and a 67 percent rollback of hydrocarbon emissions.[4]
 
 
 8
 On June 15, 1973, the Administrator approved some portions and disapproved other portions of the Maryland, Virginia and District of Columbia plans, noting that they contained certain regulatory and enforcement deficiencies, including a failure of the jurisdictions to guarantee that their legislatures would adopt laws and approve appropriations necessary to carry out the proposed measures. 38 Fed.Reg. 16556-57, 16558-59, 16563 (June 22, 1973). After the jurisdictions submitted supplemental material to cure some deficiencies, the Administrator, acting pursuant to section 110(c), published a proposed plan for each of the three portions of the Region and scheduled the necessary public hearings thereon. 38 Fed.Reg. 20758, 20779, 20789 (Aug. 2, 1973). At the same time, EPA announced its determination that the primary ambient air quality standards could not be achieved in the Region before May 31, 1977, and accordingly proposed to give each jurisdiction a two-year extension pursuant to section 110. A "preamble" to the EPA's transportation control plan was promulgated on November 6, 1973, 38 Fed.Reg. 30626, and regulations for the preconstruction review of parking facilities were released a week later, 38 Fed.Reg. 31536 (Nov. 15, 1973). On December 6, 1973, the balance of the regulations in the National Capital transportation control plan were issued, including a two-year extension of the attainment dates for each jurisdiction.[5] 38 Fed.Reg. 33702-31. This plan was incorporated in essentially identical form into the implementation plans for each jurisdiction. 40 C.F.R. Part 52, Subparts J(D.C.), V(Maryland), and VV(Virginia). These regulations are set out as an Appendix to this opinion and form the basis for this appeal.[6]
 
 
 9
 C. The Structure of the Transportation Control Regulations
 
 
 10
 As promulgated, the EPA's plan imposes the following transportation control measures:
 
 
 11
 (1) A commitment to purchase 475 additional buses for the regional bus fleet by 1977, costs to be spread over the three jurisdictions. (40 C.F.R. §§ 52.476(g), 52.1080(g), 52.2435(e));[7]
 
 
 12
 (2) The creation of reversible, exclusive express bus lanes on specified corridors within the Region by January 1, 1975. (40 C.F.R. §§ 52.476(h), 52.1080(h), 52.2435(f));
 
 
 13
 (3) The adoption of an inspection and maintenance program by each of the three jurisdictions, applicable to all vehicles registered in the Region except antiques. The initial inspection cycle is to be completed by January 1, 1976. Failed vehicles must be retested within two weeks, and the jurisdictions must also adopt a program of enforcement to prevent intentional readjustment subsequent to the inspection. (40 C.F.R. §§ 52.490, 52.1089, 52.2441);
 
 
 14
 (4) The creation of a network of at least 60 miles of bicycle lanes, built to EPA specifications, in each jurisdiction by July 1, 1976, and a requirement that all operators of automobile parking lots containing more than 50 spaces provide bicycle storage facilities. (40 C.F.R. §§ 52.491, 52.1090, 52.2442);
 
 
 15
 (5) The retrofit of pre-1973 medium-duty vehicles, not required to be retrofitted with an oxidizing catalyst, with an Air/Fuel Control device. This is an unspecified system which is designed to increase the air/fuel ratio on which the engine operates and which must result in a 15 percent reduction in hydrocarbons and a 30 percent reduction in carbon monoxide emissions. The retrofit is to be completed by May 31, 1976. (40 C.F.R. §§ 52.492, 52.1091, 52.2444);
 
 
 16
 (6) The retrofit of all heavy-duty vehicles with an Air/Fuel Control device by May 31, 1977. This is the same type of system as in (5), but it must result in a 30 percent reduction in hydrocarbons and a 40 percent reduction in carbon monoxide emissions. (40 C.F.R. §§ 52.494, 52.1092, 52.2446);
 
 
 17
 (7) The retrofit of light-duty fleet vehicles (taxis, etc.) and medium-duty vehicles of model years 1971 through 1975 with an oxidizing catalyst device. (40 C.F.R. §§ 52.495, 52.1093, 52.2446). (The EPA states in its Brief, p. 41, that this regulation is being revoked in light of recent disclosures that catalytic converters emit sulphuric acid mists which may pose a significant health hazard);
 
 
 18
 (8) The retrofit of all pre-1968 light-duty vehicles (i. e. passenger cars) with a Vacuum Spark Advance Disconnect (VSAD) by January 1, 1976. This is an unspecified device that prevents the ignition vacuum advance from working at slow speeds or in low gear. It must produce at least 25 percent reduction in hydrocarbons and 9 percent reduction in carbon monoxide emissions. (40 C.F.R. §§ 52.496, 52.1094, 52.2447).
 
 
 19
 The plan originally contained provisions for parking surcharges,[8] elimination of free on-street commuter parking,[9] elimination of free employee parking[10] and the establishment of fees for federal parking facilities.[11] The surcharge regulations were subsequently revoked, 39 Fed.Reg. 1848 (Jan. 15, 1974), and Congress has since prohibited their use. See 42 U.S.C. § 1857c-5(c)(2)(B). While the others apparently have not yet been specifically revoked, the EPA concedes[12] that the regulations relating to employee parking and federal parking facilities fall within the definition of "parking surcharge regulation" in section 1857c-5(c)(2)(D)(i) and thus are void. The EPA rejected the state-proposed ban on deliveries by heavy-duty vehicles during certain hours in favor of a retrofit strategy because of enforcement problems and uncertainties in the amount of pollution abatement which would be achieved. Finally, the transportation control plans include gasoline vapor recovery regulations,[13] parking management regulations[14] and provisions for the control of dry cleaning solvent evaporation[15] which are not challenged by the instant petitioners.
 
 
 20
 The vehicle inspection and retrofit regulations all follow the same basic pattern:
 
 
 21
 (a) Definitions.
 
 
 22
 (b) The regulation is made applicable to each state's portion of the National Capital Region.
 
 
 23
 (c) The state is ordered to establish a particular program and to submit a detailed compliance schedule containing the steps it will take to establish and enforce the program and the text of all proposed statutes and regulations needed for enforcement.
 
 
 24
 (d) By a set date, the state is ordered to submit legally adopted regulations establishing the program in compliance with EPA specifications.
 
 
 25
 (e) The state is prohibited from registering any non-conforming vehicle or allowing the operation of such vehicles on its streets and highways.
 
 
 26
 (f) Vehicle owners are prohibited from operating or permitting the operation of non-conforming vehicles.
 
 
 27
 The express bus lane regulations consist of an order that the state construct such lanes along specified corridors according to EPA blueprint and a requirement for the submission of a compliance schedule. The bicycle lane/storage facilities regulations contain similar orders for the enactment of the program and the submission of a compliance schedule and legally adopted regulations. In addition, they require each state to conduct a comprehensive study of bicycle utilization and the feasibility of various designs. In the case of mandatory bus purchases to increase the regional bus fleet, each state is ordered to submit documents showing that the necessary financial commitments have been made by the state or by its local governments.II.
 
 
 28
 Virginia, Maryland and the local governments argue that the EPA regulations violate the principles of federalism embodied in the Tenth Amendment, that enforcement of the penalty provisions of the Clean Air Act against state officials would violate the constitutional guarantee of a republican form of govern-ment,[16] that enforcement against local officials would unconstitutionally interfere with the authority of the state over its political subdivisions, and that the Clean Air Act does not authorize the EPA to require states to enact laws or enforce federally-imposed implementation plans. In addition, Virginia and Maryland assert that various portions of the EPA plan are arbitrary and capricious. The District of Columbia makes generally the same points, but it also argues that elimination of the parking surcharges has made the implementation plans insufficient to attain the air quality standards and therefore the entire regulatory scheme should be remanded to the EPA for reevaluation. In keeping with the general policy of federal courts that constitutional questions should be avoided if the case can be decided on statutory grounds, see Rescue Army v. Municipal Court, 331 U.S. 549, 568-69, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947), we shall first consider petitioners' claim that the Clean Air Act does not authorize the EPA to require the states to enact laws or administer and enforce implementation plans.
 
 A. EPA Powers under the Clean Air Act
 
 29
 The Clean Air Act places considerable emphasis on the role of the states in achieving the national air quality standards:
 
 
 30
 Each State shall have the primary responsibility for assuring air quality within the entire geographic area comprising such State by submitting an implementation plan for such State which will specify the manner in which national primary and secondary ambient air quality standards will be achieved and maintained within each air quality control region in such State.
 
 
 31
 42 U.S.C. § 1857c-2(a). After the states have fulfilled this "responsibility" by submitting implementation plans for EPA approval, the Administrator is directed to disapprove those submissions to the extent that they fail to contain certain elements enumerated in section 110(a)(2). For purposes of this action, the relevant elements are subsection (B) of that section which requires that plans contain necessary emission limitations "including, but not limited to, . . . transportation controls;" subsection (F)(i) which requires plans to contain "necessary assurances that the State will have adequate personnel, funding and authority to carry out such implementation plan;" and subsection (G) which prevents approval of a state-submitted plan unless "it provides, to the extent necessary and practicable, for periodic inspection and testing of motor vehicles to enforce compliance with applicable emission standards."
 
 
 32
 When he concluded that the Maryland, Virginia and District of Columbia plans were deficient in certain respects, the Administrator was required by section 110(c) to promulgate his own regulations which would be enforced as the "applicable implementation plans." However, he also believed that it would be inefficient and impractical for the federal government to assume the responsibility for enforcing the regulations he was promulgating. In addition he decided that direct federal enforcement was not the means contemplated by the Act.[17] The Administrator's reasoning is set forth in detail in the general preamble to all the transportation control plans, 38 Fed.Reg. 30632-33 (Nov. 6, 1973).
 
 
 33
 The regulations ultimately issued by the Administrator are a carefully constructed device to get around the dilemma posed by his lack of means for forcing the states to submit adequate implementation plans under section 110(a)[18] and his reluctance to undertake enforcement of his own regulations. Exercising his authority to promulgate implementation plans under section 110(c), he incorporated in each EPA plan requirements that the states adopt regulations establishing programs along EPA guidelines. Since he had shoved the responsibility for adopting regulations back onto the states, he also required them to conduct evaluations of the devices which would be installed under the retrofit programs and to conduct other studies which would be needed to form complete regulations and to establish an evidentiary basis to support the use of various transportation control strategies. Finally, he included provisions which will have the effect of requiring the states to use their agencies and personnel to administer the EPA programs and to appropriate state funds in amounts sufficient to carry out enforcement of the regulations which the EPA has promulgated.
 
 
 34
 Under this federal regulatory scheme, the failure of a state to enact or administer an EPA-imposed program has now become itself a violation of the implementation plan, and the state would supposedly be subject to enforcement proceedings under section 113 if it failed to comply. This enforcement by the EPA could include imposition of steep fines and imprisonment of recalcitrant state and municipal officials under section 113(c).[19] Petitioners argue that the Clean Air Act does not confer upon the Administrator power to compel states to enact regulatory programs or to require that they administer and enforce applicable implementation plans. The latter issue will be the same whether the applicable plan has been adopted by the state or was promulgated by the Administrator.
 
 
 35
 The Administrator's argument in support of his authority to promulgate the instant regulations is based primarily upon the fact that section 113 provides for federal enforcement of an "applicable implementation plan" against "any person" who is in violation of "any requirement of such plan." Section 302(e) of the Act provides:
 
 When used in this chapter
 
 36
 (e) the term "person" includes . . . (a) State, municipality, and political subdivision of a State.
 
 
 37
 42 U.S.C. § 1857h(e). On the basis of this language, the Administrator reasoned as follows:
 
 
 38
 The question remains, what kinds of requirements must a State or other governmental entity comply with? The most obvious situation is one in which a State is operating a direct stationary pollution source such as a municipal incinerator. It is no less clear, however, that the Act allows the control of many kinds of direct and indirect sources relating to mobile pollution. Parking and road facilities constitute such sources and the control of them is a valid exercise of the authority in section 110(a)(2)(B) and 110(c) to promulgate such regulations as may be necessary to attain the national ambient air quality standards.
 
 
 39
 The Administrator is also promulgating regulations requiring that vehicles allowed to operate on public roads be inspected or "retrofitted" with emission control equipment. Use of public roads by large numbers of publicly registered and regulated vehicles without either proper maintenance or adequate control equipment also causes damage to health. The requirement that the road owners and the licensing and regulating authorities prohibit such use is a reasonable means of preventing such damage.
 
 
 40
 38 Fed.Reg. 30632-33 (Nov. 6, 1973). Such an interpretation by the officer primarily responsible for federal enforcement of the air quality standards is entitled to considerable deference. Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).
 
 
 41
 We agree with the Administrator that by including the states and their subdivisions within the definition of "person," Congress clearly intended that state-operated activities which are direct sources of air pollution would be subject to federal regulation the same as private pollution sources. Furthermore, the language in the statute is broad enough to include authority to require that the states conform their transportation systems to federal standards, e. g. by constructing exclusive bus lanes or expanding their bus fleets. However, an analysis of the language of the Act, and particularly of its enforcement provisions, does not appear to support the Administrator's claim that Congress intended to authorize him to regulate sources of pollution caused by the general public by requiring the states to enact statutes and to administer and enforce the programs contained in the EPA plan.
 
 
 42
 When a state fails to submit a plan or submits an inadequate one under section 110(a), the Administrator is directed by section 110(c) to "promptly prepare and publish proposed regulations setting forth an implementation plan, or portion thereof, for a State . . . ." Under section 110(d), an "applicable implementation plan" is "the implementation plan, or most recent revision thereof, which has been approved under subsection (a) of this section (i. e., a state-submitted plan) or promulgated under subsection (c) of this section (i. e., a plan promulgated by the Administrator) . . . ." The federal enforcement procedures of section 113 are directed to correcting violations of the provisions of this "applicable implementation plan."
 
 
 43
 Section 110(c) is in fact the Administrator's only recourse when he disapproves a state-submitted plan in whole or in part, or if the state fails to submit a plan, since the Act contains no enforcement mechanisms which could be used to force a reluctant state to adopt and submit an adequate plan under section 110(a). See Plan for Arcadia v. Anita Associates, 379 F.Supp. 311 (C.D.Cal.1973), Aff'd, 501 F.2d 390 (9th Cir. 1974):
 
 
 44
 (T)here is no judicial remedy provided in the Act or elsewhere for the failure of the state to adopt and submit a plan. The only consequence of a state's failure to submit a plan is that the Administrator, then, has the duty to impose a plan upon the state, and no other remedy against the state exists.
 
 
 45
 379 F.Supp. at 314.
 
 
 46
 Of course, the Administrator's authority to promulgate a plan to replace an inadequate state plan means that he is not, as a practical matter, powerless to remedy deficiencies. In NRDC v. EPA, 478 F.2d 875 (1st Cir. 1973), the court rejected the Administrator's protestations of helplessness and concluded instead:
 
 
 47
 We hold that these statutory provisions not only empower, but also require, the Administrator to disapprove state statutes and regulations, or portions thereof, which are not in accordance with the requirements of the Clean Air Amendments. Congress plainly intended the federal statute and regulations promulgated thereunder to take precedence over state laws and regulations. By enabling the Administrator to insert his own regulations in a state plan, it provided him with the needed authority to substitute appropriate provisions for inappropriate ones. Thereafter, as legal components of the state plan, the Administrator's regulations may be both federally and locally enforced; violations thereof are violations of a state plan. § 1857c-8(a)(1); See §§ 1857c-7(d)(1), 1857c-9(b).
 
 
 48
 Id. at 888.
 
 
 49
 In our opinion, the logical interpretation of the procedures established in section 110 is that Congress intended the regulations promulgated by the Administrator under section 110(c) to be the actual substantive regulations which would be enforced against sources of air pollution. We find nothing in the language of the Act which would indicate Congress felt that State-adopted regulations are essential to achieve the federal goal of regulating air pollution.[20] On the contrary, section 110(c) specifically contemplates that some states would fail to live up to their "responsibility." As the First Circuit indicated in NRDC v. EPA, supra, the Administrator's authority to substitute his own regulations gives him ample power to correct deficient state plans in those instances.
 
 
 50
 Had Congress intended to adopt the novel approach of empowering a federal agency to order unconsenting states to enact state statutes and regulations, thereby converting state legislatures into arms of the EPA, it most likely would have made that intent clear in the statute. It chose instead to adopt the quite unremarkable procedure of authorizing the promulgation of federal regulations to govern an area it believed to be subject to its commerce power, in those instances where state enactments did not meet federal standards. The states were simply given an opportunity to bring their regulations into line within a specified time. Nothing in the Act suggests Congress saw any deficiency in its authority to regulate the subject of air pollution which would require it to utilize the device of regulating by ordering state and municipal governmental units to adopt regulations.
 
 
 51
 The enforcement provisions of the Act, contained in section 113, present further evidence that the Administrator's power over the states is not as extensive as he claims. Section 113(a)(1) enables him to bring federal enforcement procedures to bear on individual violations of an applicable implementation plan:
 
 
 52
 Whenever, on the basis of any information available to him, the Administrator finds that any person is in violation of any requirement of an applicable implementation plan, the Administrator shall notify the person in violation of the plan and the State in which the plan applies of such finding. If such violation extends beyond the 30th day after the date of the Administrator's notification, the Administrator may issue an order requiring such person to comply with the requirements of such plan or he may bring a civil action in accordance with subsection (b) of this section.
 
 
 53
 42 U.S.C. § 1857c-8(a)(1). This statute quite clearly contemplates that "the person in violation of the plan" and "the State in which the plan applies" may be two distinct entities. If Congress had expected that the states would be compelled, under pain of federal penalties, to enact and use their police power to enforce the plan, there would have been little point in requiring that two notices be given. The most "efficient" enforcement from the standpoint of commitment of federal resources would be to order the state to take action against the violator and proceed against state officials under section 113(b) or (c) if they fail to act. Furthermore, this section clearly indicates that of the two parties who are given notice, enforcement via compliance order or civil action is to be directed against the "person in violation" I. e., the actual polluter, rather than the state.
 
 
 54
 Section 113(a)(2) authorizes the Administrator to take over direct federal enforcement of an implementation plan when he discovers widespread violations:
 
 
 55
 Whenever, on the basis of information available to him, the Administrator finds that violations of an applicable implementation plan are so widespread that such violations appear to result from a failure of the State in which the plan applies to enforce the plan effectively, he shall so notify the State. If the Administrator finds such failure extends beyond the 30th day after such notice, he shall give public notice of such finding. During the period beginning with such public notice and ending when such State satisfies the Administrator that it will enforce such plan (hereafter referred to in this section as "period of federally assumed enforcement"), the Administrator may enforce any requirement of such plan with respect to any person
 
 
 56
 (A) by issuing an order to comply with such requirement, or
 
 
 57
 (B) by bringing a civil action under subsection (b) of this section.
 
 
 58
 42 U.S.C. § 1857c-8(a)(2). Assuming the Administrator correctly determined that Congress intended to give him the power to force the states to administer air quality regulations, his power to assume federal enforcement under this subsection confers no enforcement authority not already available under subsection (1) unless one postulates a situation where the state is unable to comply with an enforcement order. This provision draws a clear distinction between "violations of an applicable implementation plan" and "a failure of the State in which the plan applies to enforce the plan effectively." Since widespread violations "result from" a state's failure to enforce a plan, the language strongly suggests Congress did not believe that inadequate state enforcement was, by itself, a "violation." Rather, the term "violation" must logically refer to the emission of pollutants into the air contrary to the provisions of an applicable implementation plan.
 
 
 59
 The procedures to be followed by the Administrator in commencing the " period of federally assumed enforcement" are further evidence that Congress intended his powers over the states to be limited. Upon discovering widespread violations, he gives notice To the state. If he finds that the state's failure to enforce the plan effectively extends beyond 30 days after this first notice, the Administrator is directed to issue a Public notice of that finding. The "period of federally assumed enforcement" commences with this second notice. Had Congress intended that a state's failure to enforce the plan would be a "violation," a single notice would have sufficed as in subsection (1). Moreover, the fact that the second notice must be "public notice" indicates a congressional intent that the enforcement mechanisms which become available during the "period of federally assumed enforcement" (including the immediate possibility of daily fines, See section 113(c)(1)(A)(i)), are to be used by the Administrator against those guilty of emitting excess pollutants rather than against the state. Finally, the provision for terminating the federal enforcement period suggests that the statute contemplates the state's act of satisfying the Administrator "that it will enforce such plan" will be an act of voluntary cooperation rather than one made under the compulsion of a compliance order or civil action.
 
 
 60
 In summary, we can find little in the language of the Act to indicate that the Administrator has been empowered to order that legislatures and municipal bodies in the states enact statutes and regulations or to bring federal enforcement actions against those governmental units to do so. Congress did not find it necessary to provide any means of directly forcing the states to comply with the mandate in section 110(a)(1) that they "shall" submit implementation plans. Under such circumstances the term is directory and not mandatory. Nor is there any basis in the Act to infer that Congress intended the Administrator to accomplish the identical result indirectly through his power to promulgate his own regulations.
 
 
 61
 By ordering the states to enact and submit regulations after their initial plans were found to be inadequate, rather than promulgating his own regulations directly controlling sources of air pollution, the Administrator has thus exceeded the authority conferred upon him by section 110(c) of the Clean Air Act. Also, to the extent that he has left to the states the preparation of regulations needed to implement the clean air standards, he has failed to perform his duty under section 110 to promulgate an "applicable implementation plan" which provides for the "attainment" and " maintenance" of those standards and which can be enforced against "violations" under section 113. Finally, insofar as the various studies of transportation control methods and evaluations of retrofit devices which the Administrator's regulations require the states to submit are necessary to fill in the details of the regulations and to create an evidentiary record supporting their adoption, the Administrator has further failed to meet his statutory responsibility under section 110(c).
 
 
 62
 We therefore must vacate those portions of the instant regulations which order the states and municipalities to enact statutes and regulations or to take other actions, such as approving devices to be installed in vehicles, that are necessary in order to complete the regulatory scheme. Congress placed these duties on the Administrator, not the states when state-submitted plans are found to be insufficient. The particular regulations which are affected by this holding are parts of section (c) and all of section (d) of each retrofit regulation, portions of sections (c) and (f) of each inspection and maintenance regulation and sections (d), (e), (f) and (g) of the bicycle lanes and storage facilities regulations.[21] Since the regulations and studies which would have been supplied by the states under these provisions were necessary for the formation of a complete regulatory program, it will be necessary to remand them to the Administrator with directions that he promulgate a full set of transportation control regulations for the attainment of the air quality standards and insert them in place of the portions of each state's implementation plan which was found deficient.
 
 
 63
 There remains one aspect of the inspection and retrofit regulations which has not yet been considered. Each regulation directs the state to affirmatively establish the particular program to assure the inspection or retrofit of each vehicle of a certain class registered in that state. Each also prohibits the state from registering any non-conforming vehicle or allowing such vehicles to operate on its streets and highways. Arguably there is a difference between ordering the states to adopt a particular statute and ordering them to enforce a federal regulation against vehicles which they register. In other words, even though the states may not be compelled to enact statutes to fill in the details of the Administrator's regulations, it may be argued that they can be ordered to take actions which implement the federally imposed regulations. While as a practical matter the states may have to enact auxiliary statutes or state regulations to carry out the federal regulation, the latter approach would not be directly contrary to the requirement in section 110(c) that the Administrator, and not the states, promulgate the substitute regulations when state-submitted plans are found to be inadequate.
 
 
 64
 As discussed above, the specific language of the Act suggests that Congress did not confer such authority any more than it intended that the states would be ordered to adopt statutes. On the other hand, nowhere in the Act is the Administrator specifically told that he lacks authority to force the states to administer the plans he has promulgated when the plan is directed to a traditional state function such as registering and licensing motor vehicles. At least in the case of inspection and maintenance programs, it is apparent from the legislative history that Congress did intend that the states would be required to cooperate in administering a federal air quality program.
 
 
 65
 Section 110(a)(2)(G) requires that each state plan provide "to the extent necessary and practicable, for periodic inspection and testing of motor vehicles to enforce compliance with applicable emission standards" before it can meet with EPA approval. The House Report on the bill stated:
 
 
 66
 (T)he legislation provides that States must require inspection of motor vehicles in actual use if the . . . (Administrator), after consultation with the State, determines that the achievement of ambient air quality standards requires such inspection and that such inspection is technologically and economically feasible.
 
 
 67
 H.Rep.No.91-1146, 91st Cong., 2d Sess. 3-4 (June 3, 1970), U.S.Code Cong. & Admin.News 1970, pp. 5356, 5359 (emphasis added). The Senate Report contains similar language:
 
 
 68
 The implementation plan section of the proposed bill would specifically provide that, to the extent necessary, Each region develop motor vehicle inspection and testing programs for which it is eligible to receive assistance under Section 208 (now 210) of the proposed bill. The Committee believes that this is an extremely important provision . . . . It is also a class of air pollution sources for which the regions and the States have better opportunities to control.
 
 
 69
 S.Rep.No.91-1196, 91st Cong., 2d Sess. 13 (Sept. 17, 1970) (emphasis added). As the court noted in Pennsylvania v. EPA, 500 F.2d 246, 258 (3d Cir. 1974), if Congress intended to require the states to establish inspection programs, it possibly would have no objection to the states also being forced to administer other EPA-imposed programs. There were in fact certain statements made during the course of congressional debate which suggest an intent to confer this broader power. For example, Congressman Staggers, the Committee Chairman and floor manager of the bill in the House, stated:
 
 
 70
 If we left it all to the Federal Government, we would have about everybody on the payroll of the United States. We know this is not practical. Therefore, the Federal Government sets the standards, we tell the States what they must do and what standards they must meet. These standards must be put into effect by the communities and the states, and We expect them to have the means to do the actual enforcing.
 
 
 71
 116 Cong.Rec. 19204 (June 10, 1970) (Emphasis added).[22]
 
 
 72
 As we have seen, the actual language of the Act does not in every instance necessarily support these broad assertions in the legislative history. However, since the Act itself does not specifically reject the Administrator's claim of power to force the states to administer EPA-promulgated transportation control programs, we shall consider the question of whether Congress may constitutionally regulate the states in this manner.
 
 
 73
 B. The Permissible Extent of Congressional Regulation of State Activities under the Commerce Clause
 
 
 74
 None of the petitioners challenge the congressional determination that air pollution has a substantial effect on interstate commerce and therefore may be regulated by the federal government under the commerce clause. There is judicial precedent for upholding this exercise of federal jurisdiction. See, e. g., South Terminal Corp. v. EPA, 504 F.2d 646, 677 (1st Cir. 1974); Pennsylvania v. EPA, 500 F.2d 246, 259 (3d Cir. 1974). With respect to transportation controls, the federal government thus clearly has the power to direct owners of motor vehicles to install emission control devices and maintain them in proper adjustment.
 
 
 75
 It is equally clear that an activity is not exempted from federal commerce power regulation simply because it is owned or operated by a state, and this is true whether the function being regulated is characterized as " governmental" or "proprietary." The principal authority on this issue is Maryland v. Wirtz, 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968), which held that the wages of employees at state-operated schools and hospitals are properly subject to regulation under the minimum wage and maximum hour provisions of the federal Fair Labor Standards Act. Rejecting an argument that the federal commerce power must yield when the state is performing a governmental function, the Court declared:
 
 
 76
 (I)t is clear that the Federal Government, when acting within a delegated power, may override countervailing state interests whether these be described as "governmental" or "proprietary" in character. As long ago as Sanitary District v. United States, 266 U.S. 405 (45 S.Ct. 176, 69 L.Ed. 352), the Court put to rest the contention that state concerns might constitutionally "outweigh" the importance of an otherwise valid federal statute regulating commerce.
 
 
 77
 392 U.S. at 195-96, 88 S.Ct. at 2023. The Court then turned to the question of whether the particular statute was "an otherwise valid regulation of commerce," and concluded:
 
 
 78
 This court has always recognized that the power to regulate commerce, though broad indeed, has limits. . . .
 
 
 79
 But while the commerce power has limits, valid general regulations of commerce do not cease to be regulations of commerce because a State is involved. If a State is engaging in economic activities that are validly regulated by the Federal Government when engaged in by private persons, the State too may be forced to conform its activities to federal regulation.
 
 
 80
 Id. at 196-97, 88 S.Ct. at 2024. See also Parden v. Terminal Railway, 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964), and United States v. California, 297 U.S. 175, 183-85, 56 S.Ct. 421, 80 L.Ed. 567 (1936), both upholding federal regulations as applied to state-owned railroads; Board of Trustees v. United States, 289 U.S. 48, 53 S.Ct. 509, 77 L.Ed. 1025 (1933), which required a state university to pay federal customs duties on imported equipment; and Sanitary District v. United States, 266 U.S. 405, 45 S.Ct. 176, 69 L.Ed. 352 (1925). In its most recent decision in this area, Fry v. United States, 421 U.S. 542, 95 S.Ct. 1792, 44 L.Ed.2d 363 (1975), the Court upheld, on the basis of Wirtz, the application of federal wage control regulations to the wages of all state employees.[23]
 
 
 81
 Once Congress has properly determined that the emission of pollutants into the air has an effect on interstate commerce, it has power to regulate activities which generate that pollution either directly or indirectly, and it is irrelevant that a particular source of pollution is operated by the state. Moreover, where federal regulations duly adopted pursuant to the commerce power come into conflict with state practices and regulations, the federal regulations must prevail under the Supremacy Clause. See Fry v. United States, supra, 421 U.S. at 556-58, 95 S.Ct. 1792 (1975); Public Utilities Comm'n v. United States, 355 U.S. 534, 544, 78 S.Ct. 446, 2 L.Ed.2d 470 (1958).
 
 
 82
 In light of the foregoing decisions, it is possible to determine that certain of the Administrator's regulations are valid exercises of the federal commerce power. Where a state is directly operating the source of air pollution, E. g., a state-owned fleet of automobiles, Congress has quite properly required that it conform to EPA regulations. The provisions requiring construction of exclusive bus lanes and purchases of additional buses arise from the regulation of "indirect" sources. The streets and highways and bus systems of the states are not being regulated by the Administrator as direct emitters of pollution but rather as factors which influence the use of pollution sources by other parties. We believe that these state-owned transportation systems are analogous to the railroad operated by the state in United States v. California, supra. This situation is similar to federal statutes passed in the 1890's requiring the railroads to operate safe trains. 45 U.S.C. § 1 Et seq. Acting under its commerce power, the federal government thus can order the states to operate their transportation systems in accordance with federal regulations designed to protect the health of the nation's citizens by requiring them to purchase buses and construct exclusive bus lanes. Obviously this may be financially burdensome, but "when Congress does act (under the commerce power), it may place new or even enormous fiscal burdens on the States." Employees of the Department of Public Health and Welfare v. Department of Public Health and Welfare, 411 U.S. 279, 284, 93 S.Ct. 1614, 1618, 36 L.Ed.2d 251 (1973).
 
 
 83
 We have somewhat more difficulty with the requirement that the states construct a system of bicycle lanes, since this requires construction of an additional separate transportation system rather than simply modifications to those presently in operation. However, since we set aside the regulations relating to bicycle lanes and storage facilities in Part III, D., Infra, on the ground that they were not supported by adequate evidence in the record, there is no need for further discussion of their constitutionality at this time.
 
 
 84
 The inspection and maintenance regulations and the retrofit regulations involve a regulatory approach of a quite different nature. The activity that is the actual target of the federal commerce power in this case is the operation of vehicles which are not properly equipped or maintained. Obviously the responsible parties here are the actual owners and operators of such vehicles, and the Administrator has properly included in each regulation a provision which prohibits them from operating non-conforming vehicles. However, each federally-promulgated regulation includes provisions ordering the states to enact statutes and to establish and administer programs to force their citizens to comply with this federal directive. Petitioners argue that this involves an intrusion into state sovereignty far beyond the regulations approved in Wirtz and California Since the federal government is here requiring that the states regulate interstate commerce and thus would be appropriating state legislative and regulatory power to be used to accomplish a federal regulatory objective.[24]
 
 
 85
 The Administrator began his analysis of the federal power to regulate the states by observing that they have contributed to air pollution by adopting certain transportation policies which encourage the use of motor vehicles.[25] As we have indicated, he correctly determined that the federal government could order the states to modify their transportation systems to correct this problem by constructing bus lanes and purchasing additional buses. Turning to his promulgation of inspection and retrofit regulations, he gave two justifications for requiring the states to enact and enforce these regulations. First, "(d)irect Federal enforcement and massive, duplicative Federal programs aimed at vehicles on an individual basis were not the means contemplated by the Act to solve these problems." 38 Fed.Reg. 30633 (Nov. 6, 1973). Second, he concluded "that the amendments of 1970 were designed to cure deficiencies that had resulted from total reliance upon state and local action to solve what was increasingly recognized as a national health problem." Id.
 
 
 86
 In Pennsylvania v. EPA, 500 F.2d 246 (3d Cir. 1974), the Third Circuit upheld the Administrator's power to direct the states to administer federally promulgated regulations, concluding:
 
 
 87
 In enacting the Clean Air Amendments of 1970, Congress created an interlocking governmental structure in which the Federal Government and the states would cooperate to reach the primary goal of the Act the attainment of national ambient air quality standards. Under its provisions, state and local governments retain responsibility for the basic design and implementation of air pollution strategies, subject to approval and, if necessary, Enforcement by the Administrator. We believe that this approach represents a valid adaption of federalist principles to the need for increased federal involvement. The only alternative implementation would be for the Federal Government to assume some of the functions of traffic control and vehicle registration and directly enforce the programs contained in the various transportation control plans. The Administrator has determined that this would not be a practicable way of attaining national air quality standards . . . and we fail to see how this would represent less of an intrusion upon state sovereignty.
 
 
 88
 Id. at 262-63 (emphasis added).
 
 
 89
 While we have previously held that the Clean Air Act does not empower the Administrator to order non-consenting states to enact statutes or regulations in those areas where it is his duty to promulgate regulations, we have yet to consider the validity of those provisions which provide that the " State shall not register or allow to operate on its streets or highways any (non-complying) vehicle(s)." Is this regulation within the commerce power? In Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824), Chief Justice Marshall laid the groundwork for answering this question when he stated that the power granted by the commerce clause was a
 
 
 90
 . . . power to Regulate ; that is, to prescribe the rule by which commerce is to be governed.
 
 
 91
 22 U.S. (9 Wheat.) at 196 (emphasis added). In the provision prohibiting the licensing or use of non-complying vehicles, it is our opinion that the Administrator, acting pursuant to Congressional authority, has merely prescribed a rule by which commerce on state streets and highways is to be governed. Thus, we find the restraints on vehicle registration to be valid. In doing so, as we noted previously, there is a similarity to the longstanding Federal Safety Appliance Act which prohibits use of unsafe equipment on railroads. 45 U.S.C. § 1 Et seq. Also, the federal regulation is directly related to existing activities presently being carried on by the states, and it does not specify the manner in which the state is to comply. A state may comply with the prohibition on registering nonconforming vehicles merely by requiring applicants for vehicle registration to submit a certificate of compliance obtained from federal officials or from private sources not manned by state personnel.
 
 
 92
 Beyond that, we draw the line and hold that the Administrator, in the exercise of federal power based solely on the commerce clause, cannot against a state's wishes compel it to become involved in administering the details of the regulatory scheme promulgated by the Administrator. For example, the attempt to require the state to "establish" each of the retrofit programs and to "evaluate and approve devices for use in this program," contained in section (c) of each retrofit regulation, is an impermissible encroachment on state sovereignty and goes beyond "regulation" by the Congress. It seeks, under the guise of the commerce power, to substitute compelled state regulation for permissible federal regulation. If the federal government wants to impose a program under federal authority, it is limited by the restrictions applicable thereto.
 
 
 93
 Actually, in extending the commerce power to the tremendous limits it has been pressed in recent years, the Congress and the Courts are most probably exceeding the intent of those who wrote the Constitution. In an 1829 letter, James Madison wrote to J. C. Cabell as follows:
 
 
 94
 For a like reason, I made no reference to the "power to regulate commerce among the several States." I always foresaw that difficulties might be started in relation to that power which could not be fully explained without recurring to views of it, which, however just, might give birth to specious though unsound objections. Being in the same terms with the power over foreign commerce, the same extent, if taken literally, would belong to it. Yet it is very certain that it grew out of the abuse of the power by the importing States in taxing the non-importing, and was intended as a negative and preventive provision against injustice among the States themselves, rather than as a power to be used for the positive purposes of the General Government, in which alone, however, the remedial power could be lodged.
 
 
 95
 3 M. Farrand, Records of the Federal Convention 478 (rev. ed. 1966), Quoting from IV Letters and other Writings of James Madison 14-15. There is no question that the commerce power is here being used not as a "preventive provision against injustice among the States . . . (but) as a power . . . for the positive purposes of the General Government." We recognize the extent to which the Supreme Court has expanded the federal commerce power, but we are not willing to expand it beyond the limits that Congress specified or court decisions presently require.
 
 
 96
 In essence, the Administrator is here attempting to commandeer the regulatory powers of the states, along with their personnel and resources, for use in administering and enforcing a federal regulatory program against the owners of motor vehicles. The situation is not too dissimilar from one that would have existed during Prohibition if the Federal Government had sought to compel police officers in a wet state to enforce the federal laws on that subject. Under the regulations here, the states are to function merely as departments of the EPA, following EPA guidelines and subject to federal penalties if they refuse to comply or if their regulation of vehicles is ineffective. We are aware of no decisions of the Supreme Court which hold that the federal government may validly exercise its commerce power by directing unconsenting states to regulate activities affecting interstate commerce, and we doubt that any exist.
 
 
 97
 What is really needed to accomplish the federal objective in this situation is state cooperation in the administration of a federal regulatory program, and Congress has available numerous means of obtaining that cooperation.[26] However, where cooperation is not forthcoming, we believe that the recourse contemplated by the commerce clause is direct federal regulation of the offending activity and not coerced state policing of the details of an intricate federal plan under threat of federal enforcement proceedings. We therefore conclude that the inspection and retrofit regulations are invalid to the extent they require unconsenting states to administer and enforce the EPA-promulgated transportation control programs other than by a mere refusal to license non-complying cars.
 
 
 98
 Petitioners attack the constitutionality of the instant regulations by arguing that they violate the protection accorded state sovereignty by the Tenth Amendment, which provides:
 
 
 99
 The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.
 
 
 100
 Although this amendment does not on its face purport to place any limitation on the exercise of powers delegated to the federal government by the commerce clause, the Supreme Court recently observed that it does have some substantive meaning:
 
 
 101
 While the Tenth Amendment has been characterized as a "truism," stating merely that "all is retained which has not been surrendered," United States v. Darby, 312 U.S. 100, 124 (61 S.Ct. 451, 462, 85 L.Ed. 609) (1941), it is not without significance. The Amendment expressly declares the constitutional policy that Congress may not exercise power in a fashion that impairs the States' integrity or their ability to function effectively in a federal system.
 
 
 102
 Fry v. United States, 421 U.S. at 547 n. 7, 95 S.Ct. at 1795 n. 7. After considering the statute under review in that case, the Court concluded that "we are convinced that the wage restriction regulations constituted no such drastic invasion of state sovereignty." Id.
 
 
 103
 The Court has not yet made clear exactly what sort of restraints the Tenth Amendment does place on federal action under the commerce clause. Wirtz explicitly rejected "the contention that state concerns might constitutionally 'outweigh' the importance of an otherwise valid federal statute regulating commerce." 392 U.S. at 195-96, 88 S.Ct. at 2023. It relied instead on the limits inherent in the commerce power as giving the Court "ample power to prevent what the appellants purport to fear, 'the utter destruction of the State as a sovereign political entity.' " Id. at 196, 88 S.Ct. at 2024. On the other hand, before commencing its discussion of the commerce power, the Court observed that the statute under review did not significantly intrude upon state powers:
 
 
 104
 The Act establishes only a minimum wage and a maximum limit of hours unless overtime wages are paid, and does not otherwise affect the way in which school and hospital duties are performed. Thus appellants' characterization of the question in this case as whether Congress may, under the guise of the commerce power, tell the States how to perform medical and educational functions is not factually accurate. Congress has "interfered with" these state functions only to the extent of providing that when a State employs people in performing such functions it is subject to the same restrictions as a wide range of other employers whose activities affect commerce, including privately operated schools and hospitals.
 
 
 105
 Id. at 193-94. In Pennsylvania v. EPA, supra, the Third Circuit discounted the relevance of this latter statement:
 
 
 106
 Although the Court noted that under the facts of the case, there did not appear to be an interference with "sovereign state functions," it stated that in any case it is inappropriate to pose the issue in this way, since any exercise by the Federal Government of its delegated powers will necessarily "interfere" with the power of the states.
 
 
 107
 500 F.2d at 259-60. However, when the Supreme Court itself interpreted Wirtz in Fry v. United States, supra, it stated:
 
 
 108
 We noted, moreover, that the statute at issue in Wirtz was quite limited in application. The federal regulation in this case is even less intrusive.
 
 
 109
 421 U.S. at 548, 95 S.Ct. at 1796.
 
 
 110
 It would thus appear that the extent of federal intrusion into state sovereignty is of some relevance even where the federal regulations are an exercise of the commerce power. Since the Tenth Amendment was described in Fry as declaring "the constitutional policy that Congress may not exercise power In a fashion that impairs the States' integrity or their ability to function in a federal system," the restrictions may be directed to the manner in which the federal government exercises its commerce power. In other words, the Tenth Amendment may prevent Congress from selecting methods of regulating which are "drastic" invasions of state sovereignty where less intrusive approaches are available. If this is the case, the mere fact that direct federal regulation of vehicles would be less "efficient" would not appear sufficient to override the serious intrusion on state sovereignty involved in forcing the states to supplant federal officials in policing the details of federal regulations.
 
 
 111
 However the Supreme Court ultimately determines to reconcile the formulation of the Tenth Amendment in Fry with the federal commerce power, we have no doubt that the inspection and retrofit regulations involve "drastic" intrusions on state sovereignty. A federal regulation which compels the states to enforce federal regulatory programs clearly "impairs the States' integrity" and "their ability to function in a federal system."[27] The Tenth Amendment thus provides an additional ground for striking down these particular regulations.
 
 
 112
 To summarize our holdings in this part, the exclusive bus lane regulations and the bus fleet regulations are valid federal regulations of state activities which affect commerce, under United States v. California, supra. The inspection and maintenance regulations and the retrofit regulations are invalid to the extent that they direct unconsenting states to enact regulations and thus go beyond the authority conferred by the Act, and in part because they require the states to administer and enforce federal regulatory programs and thus exceed constitutional power under the commerce clause. However, the commerce power does enable the federal government to prohibit the states from registering non-conforming vehicles and thus the provision to that effect in each regulation is constitutional.
 
 
 113
 At this point, the inspection and retrofit regulations consist of provisions which prohibit vehicle owners from operating vehicles that do not comply with applicable standards and prohibit the states from registering such vehicles. Although these requirements are valid exercises of the federal commerce power, and would by themselves suffice to establish each federal program, our holding that unconsenting states cannot be required to administer these federally-promulgated programs means that at present the regulations contain no method for determining which retrofit devices are approved for installation and what the applicable emission standards are. It is therefore necessary to remand the entire inspection and retrofit regulations for the National Capital Region to the Administrator with directions that he promulgate a complete and enforceable set of regulations establishing each program as promptly as possible and incorporate these in the implementation plans for this area.
 
 
 114
 There is one further matter which requires some comment. The foregoing discussion has not attempted to draw any distinction between the regulations promulgated for the District of Columbia and those covering the States of Maryland and Virginia. As a federal entity, the District is obviously in a somewhat different status than the states with regard to the extent of control Congress can assert over its affairs and does not enjoy the independent protections afforded to the states because of their sovereign status. However, the Clean Air Act treats it as a state for purposes of developing implementation plans. See 42 U.S.C. § 1857h(d). Furthermore, the Administrator has placed considerable emphasis on assuring that the transportation control programs are applied uniformly throughout the National Capital Region.[28] To preserve this approach, we shall accordingly vacate the District of Columbia portions of the regulations to the same extent as the Maryland and Virginia regulations have been determined to be invalid. If the concept of regional uniformity of regulation is to be abandoned, that determination is for the Administrator in the first instance.
 
 III.
 
 115
 As each of the regulations under review has been upheld to some extent, we shall next consider the other challenges raised by petitioners. The applicable standard for review of the Administrator's action in promulgating the various regulations which comprise the National Capital plan is the " arbitrary and capricious" standard of the Administrative Procedure Act.[29] South Terminal Corp. v. EPA, 504 F.2d 646, 655 (1st Cir. 1974). Under this test, the petitioners challenge the validity of the regulations for VSAD retrofit, retrofit of medium-and heavy-duty vehicles, development of exclusive bus lanes and construction of bicycle lanes.
 
 
 116
 A. VSAD Retrofit According to the EPA, the retrofit of all pre-1968 vehicles with a VSAD device will cost $20.00 per unit[30] and will contribute 0.9 percent of the total reduction in emissions needed to reach the national standards.[31] Petitioners base their opposition to this regulation on a balancing of the very small reduction in pollution against the cost to the public. By the time the regulation is fully implemented in 1976, most of the vehicles involved would have only a short period of useful life remaining. The District of Columbia asserts that these older cars tend to be owned by poorer persons who can least afford the cost of the retrofit. In addition, installation of a VSAD device causes a small drop in fuel economy.[32] Finally, the 0.9 percent figure assumes that all vehicles will be retrofitted, but the regulations permit the exemption of any car for which no such device is available. Thus the actual reduction in emissions could be considerably less than predicted.
 
 
 117
 The EPA's response is that economic and sociological considerations are either subordinate or irrelevant where the public health is concerned, citing South Terminal Corp. v. EPA, 504 F.2d 646, 675 (1st Cir. 1974); NRDC v. EPA, 489 F.2d 390, 411-12 (5th Cir. 1974). We have no occasion to consider this argument, however, since we do not believe the reduction in pollution to be obtained by this retrofit has been shown to be so minimal that it can be said with confidence that adopting this strategy was arbitrary and capricious. The Administrator determined that these retrofits were needed in order to achieve the overall reduction in emissions required to attain the national standards in this Region, and we find no basis for holding that this determination was clearly wrong.
 
 
 118
 Maryland and Virginia also contend that the retrofit regulations in general are arbitrary and unreasonable because the states are unable to determine what retrofit devices are practicable and approvable. They argue that instead there must be a single, uniform program of evaluating such devices. In light of our prior holding that the Act requires the Administrator to adopt complete regulations, including specification of approved devices, rather than leaving the job of supplying the details to the states, this argument has been mooted.[33] Further, we note that the EPA has already taken steps to establish a retrofit device evaluation program of its own. 40 Fed.Reg. 3495-3507 (Jan. 22, 1975).
 
 
 119
 B. Medium-and Heavy-Duty Vehicle Retrofit The attack by Maryland and Virginia on these regulations is based on the lack of certain information which is claimed to be needed to promulgate meaningful regulations, and particularly on the lack of data relating to the base line emission for trucks. The availability of this data allegedly would enable one to distinguish between a "clean" and a "dirty" truck and require that emissions from the latter be reduced by an appropriate amount. In its absence, the states argue that owners of "clean" trucks will be required to spend money to make them cleaner while the same percentage reduction for "dirty" trucks will still allow them to emit excessive pollution.
 
 
 120
 The Administrator, however, has chosen to require that all truck owners install devices which have been determined to produce a fixed percentage reduction in pollutants emitted. Under this approach, the data petitioners seek is simply irrelevant. In light of the problems which would be involved in tailoring the regulations to the different types of vehicles and to all possible operating conditions, we cannot say that the Administrator's choice of tactics is arbitrary or unreasonable.
 
 
 121
 Petitioners also argue that the regulations should be remanded to the Administrator "for an extension of implementation dates" in order to enable consideration of evaluation data being developed in a New York study of truck emissions. We note that the monthly report on that study, submitted as Addendum B to the EPA Brief, indicates that certain retrofit devices are available which will reduce emissions by the required amounts. In any event, neither this court nor the Administrator has authority to extend the implementation deadline beyond 1977. If the states are seeking an extension of interim compliance dates, they may do so by petitioning the Administrator under section 110(f) of the Act.
 
 
 122
 C. Exclusive Bus Lanes The District of Columbia objects to the Administrator's refusal to grant its request for a delay in the implementation dates for establishment of exclusive bus corridors based on various funding and planning difficulties. In rejecting the request, the Administrator stated that it had not been adequately justified because exclusive bus lanes can be easily implemented but that "EPA will consider limited extension requests warranted by the specific facts." Jt.App. 507. While he has been somewhat insensitive to the problems his regulations have caused the various jurisdictions, we do not believe the Administrator acted arbitrarily in denying this particular request for extension.
 
 
 123
 D. Bicycle Lanes/Storage Facilities The original notices of proposed rulemaking on the implementation plans made no mention of a possible promulgation of bicycle regulations. Instead, the impetus for these regulations came from testimony given at the hearings by area bicycle enthusiasts. Petitioners argue that these regulations are invalid because the Administrator failed to comply with the notice and hearing requirements of section 110(c) and 5 U.S.C. § 553(b) prior to promulgating them. However, the original notices stated that alternate forms of transportation controls would be considered at the hearings, and thus they were sufficient to give the parties notice that the agency might rely on comments tendered at the hearing in promulgating regulations, as it is allowed to do. South Terminal Corp. v. EPA, 504 F.2d 646, 659 (1st Cir. 1974); International Harvester Co. v. Ruckelshaus, 155 U.S.App.D.C. 411, 478 F.2d 615, 632 n. 51 (1973). Furthermore, the EPA afforded the interested parties an opportunity to submit comments after the regulations were promulgated, but there was no attack made at that time nor was there any request for additional hearings. Thus petitioners' claims that these regulations suffer from a procedural defect are without merit.
 
 
 124
 The only evidence in this record indicating a need for bicycle regulations and establishing the connection between these regulations and a reduction in air pollution consists of the testimony at the hearing and a study of potential bicycle utilization in Philadelphia which the EPA later announced justified its regulations.[34] After considering this evidence, we must agree with petitioners that the record is simply not sufficient to support promulgation of bicycle regulations for the National Capital Region. In particular, while the Philadelphia study might be a sufficient basis for promulgating bicycle regulations for Philadelphia, it is not adequate to establish that such regulations are necessary, desirable or practical for this Region. These regulations will accordingly be remanded to the Administrator for reconsideration. Such reconsideration should include consideration of cost factors as related to anticipated benefits.
 
 
 125
 We note that a survey of present and potential bicycle utilization in the District of Columbia has since been prepared (see Addendum E of the EPA Brief) and that its findings tend to support the EPA regulations. However, the regulations cannot be upheld on the basis of this new evidence until it has been made part of the record and petitioners have been afforded the opportunity to submit comments thereon.
 
 
 126
 E. Increased Bus Fleet The National Capital plan includes regulations requiring Virginia and Maryland to submit compliance schedules showing that they, or their local governments, and the District of Columbia have made financial commitments sufficient to enable the Washington Metropolitan Area Transit Authority (WMATA) to purchase 475 new buses. Maryland and Virginia argue that this creation of parallel agreements focusing on the same object contravenes Article I, section 10, of the Constitution, which prohibits the states from entering into any agreement or compact with another state without the consent of Congress. However, WMATA was established by a compact to which Congress consented. Pub.L. 89-774, 80 Stat. 1324 (Nov. 6, 1966). Title III, Article VII, section 18, of the WMATA compact enables the Northern Virginia Transportation District, which represents Virginia, and the Washington Suburban Transit District, which represents Maryland, to make commitments for the acquisition of transit facilities and equipment. Since Congress has already approved a compact and provided means for funding, the most that could be criticized in the regulation might be a technical error in leaving open the possibility that these commitments may be made directly to WMATA by the states rather than from the states to the Districts and thence to WMATA. However, because the result will be the same in either case, we conclude that this attack on the bus fleet regulations is without merit.
 
 
 127
 F. Incompleteness of the Present Transportation Control Plan The District of Columbia asserts that withdrawal of various regulations, and especially the demise of parking surcharge regulations, has produced a plan which is insufficient to attain the national ambient air quality standard for this Region by the target date of May 31, 1977. Because it is possible that the reevaluation of the plan necessitated by its present insufficiency may result in abandonment of programs to which the jurisdictions will have become irretrievably committed in favor of new approaches, the District argues for a remand of the entire plan to the EPA with directions that it develop a substitute set of regulations creating a comprehensive and coordinated program for attaining the air quality standards. The EPA concedes that its present plan is not sufficient to bring about the needed reduction in emissions, but it argues that it should be allowed to implement those regulations which are valid in order to make some progress toward the ultimate goal.
 
 
 128
 We believe that the EPA has taken the correct position on this issue. There has been no showing that any of the regulations in the present plan are likely to be proven unnecessary in the future. Furthermore, if we were to demand the promulgation of a perfect plan before any part of it may be enforced, the air quality standards might never be attained.
 
 IV.
 
 129
 The exclusive bus lane regulations and the increased bus fleet regulations are affirmed. To the extent that the bicycle lane and storage facilities regulations order the states to enact statutes and regulations, they are vacated as in excess of the Administrator's powers under the Clean Air Act. The remainder of the bicycle lane regulations are remanded to the Administrator because of an absence of evidence in the record supporting the need for such facilities and their feasibility. The inspection and maintenance regulations and the retrofit regulations are vacated to the extent that they have been held to be in excess of the Administrator's powers under the Act or to be unconstitutional, and are affirmed to the extent they prohibit the states from registering non-conforming vehicles and prohibit vehicle owners from operating them. These latter regulations are remanded to the Administrator with directions that he take prompt action to promulgate complete and enforceable regulations to replace the deficient implementation plans submitted by the states.
 
 
 130
 Judgment accordingly.
 
 APPENDIX
 
 131
 The following is the text of the regulations under review in this case, as promulgated in 40 C.F.R. Part 52, Subparts J(District of Columbia), V(Maryland), and VV(Virginia):
 
 Subpart J District of Columbia
 
 132
 S 52.476 Compliance schedules.
 
 
 133
 (g) With respect to the measure for increased bus fleet and service approval in § 52.472: The District of Columbia shall no later than January 31, 1974, submit a compliance schedule to put the program into effect. The compliance schedule shall, at a minimum, provide that the District of Columbia shall, on or before March 1, 1974, submit to the Administrator a statement, signed both by a representative of the Washington Metropolitan Area Transit Authority (WMATA) indicating that, in the judgment of both of them, financial commitments have been made by the District of Columbia for the purchase of buses. This statement, taken in conjunction with the commitments made by the Commonwealth of Virginia and the State of Maryland, must be sufficient to enable WMATA to purchase in the fiscal year beginning the next July 1, the number of buses below:
 
 Fiscal Year 1975 175 buses
 Fiscal Year 1976 150 buses
 Fiscal Year 1977 150 buses
 
 134
 The statement shall also indicate that WMATA has in fact committed to purchase that number of buses.
 
 
 135
 (h) With respect to the express bus lane measure approved in § 52.472:
 
 
 136
 (1) The District of Columbia shall no later than January 1, 1975, establish exclusive bus lanes in the following corridors:
 
 
 137
 (i) U.S. Route 50 from District of Columbia-Maryland boundary to Washington Central Business District (hereafter CBD).
 
 
 138
 (ii) Pennsylvania Avenue from the District of Columbia-Maryland boundary to the Washington CBD.
 
 
 139
 (iii) South Capitol Street from Bolling Air Force Base to Independence Avenue.
 
 
 140
 (iv) U.S. Route 50 from the District of Columbia-Virginia boundary to the Washington CBD.
 
 
 141
 (v) In the District of Columbia portion of a route connecting the Dulles Access Road from the Reston Interchange to the Washington CBD.
 
 
 142
 (vi) Georgia Avenue-13th Street from the District of Columbia-Maryland boundary to the Washington CBD.
 
 
 143
 (vii) U.S. Route 240 from the District of Columbia-Maryland boundary to Sheridan Circle.
 
 
 144
 (viii) New Hampshire Avenue from the District of Columbia-Maryland boundary to Grant Circle.
 
 
 145
 Such lanes shall be inbound during the morning peak and outbound during the evening peak period.
 
 
 146
 (2) The District of Columbia shall submit to the Administrator, no later than March 1, 1974, a schedule showing the steps which it will take to establish exclusive bus lanes in those corridors enumerated in paragraph (h)(1) of this section. Each schedule shall be subject to the approval by the Administrator and shall include as a minimum the following:
 
 
 147
 (i) Identification of streets or highways that shall have portions designated for exclusive bus lanes.
 
 
 148
 (ii) The date by which each street or highway shall be designated.
 
 
 149
 (3) Exclusive bus lanes must be prominently indicated by distinctively painted lines, pylons, overhead signs, or physical barriers.
 
 
 150
 (4) Application for substitution of a corridor for any of those listed in paragraph (h)(1) of this section shall be made by the District of Columbia for the Administrator's approval no later than March 1, 1974.
 
 
 151
 S 52.490 Inspection and maintenance program.
 
 
 152
 (a) Definition:
 
 
 153
 (1) "Inspection and maintenance program" means a program for reducing emissions from in-use vehicles through identifying vehicles that need emission control-related maintenance and requiring that such maintenance be performed.
 
 
 154
 (2) "Light-duty vehicle" means a gasoline-powered motor vehicle rated at 6,000 lb gross vehicle weight (GVW) or less.
 
 
 155
 (3) "Medium-duty vehicle" means a gasoline-powered motor vehicle rated at more than 6,000 lb GVW and less than 10,000 lb GVW.
 
 
 156
 (4) "Heavy-duty vehicle" means a gasoline-powered motor vehicle rated at 10,000 lb GVW or more.
 
 
 157
 (5) All other terms used in this section that are defined in Part 51, Appendix N, of this chapter are used herein with the meanings so defined.
 
 
 158
 (b) This section is applicable within the District of Columbia portion of the National Capital Interstate AQCR.
 
 
 159
 (c) In connection with the light duty vehicle inspection and maintenance program for the District of Columbia approved by the Administrator pursuant to § 52.472 the District shall establish an inspection and maintenance program applicable to all medium duty and heavy duty vehicles registered in the District that operate on public streets or highways over which it has ownership or control. The District may exempt any class or category of vehicles that the District finds is rarely used on public streets or highways (such as classic or antique vehicles). No later than April 1, 1974, the District shall submit legally adopted regulations to the Administrator establishing such a program. The regulations shall include:
 
 
 160
 (1) Provisions for inspection of all medium-duty and heavy-duty motor vehicles at periodic intervals not more than 1 year apart by means of a loaded emission test.
 
 
 161
 (2) Provisions for inspection failure criteria consistent with the failure of 30 percent of the vehicles in the first inspection cycle.
 
 
 162
 (3) Provisions to ensure that failed vehicles receive within two weeks the maintenance necessary to achieve compliance with the inspection standards. These shall include sanctions against individual owners and repair facilities, retest of failed vehicles following maintenance, use of a certification program to ensure that repair facilities performing the required maintenance have the necessary equipment, parts, and knowledgeable operators to perform the tasks satisfactorily, and use of such other measures as may be necessary or appropriate.
 
 
 163
 (4) A program of enforcement to ensure that vehicles are not intentionally readjusted or modified subsequent to the inspection and/or maintenance in such a way as would cause them to no longer comply with the inspection standards. This enforcement program might include spot checks of idle adjustment and/or a suitable type of physical tagging. This program shall include penalties for violation.
 
 
 164
 (5) Provisions for beginning the first inspection cycle by January 1, 1975, completing it by January 1, 1976.
 
 
 165
 (6) Designation of an agency or agencies responsible for conducting, overseeing, and enforcing the inspection and maintenance program.
 
 
 166
 (d) After January 1, 1976, the District shall not register or allow to operate on public streets or highways any medium-duty or heavy-duty vehicle that does not comply with the applicable standards and procedures adopted pursuant to paragraph (c) of this section. This shall not apply to the initial registration of a new motor vehicle.
 
 
 167
 (e) After January 1, 1976, no owner of a medium-duty or heavy-duty vehicle shall operate or allow the operation of such vehicle that does not comply with the applicable standards and procedures adopted pursuant to paragraph (c) of this section. This shall not apply to the initial registration of a new motor vehicle.
 
 
 168
 (f) The District shall submit, no later than February 1, 1974, a detailed compliance schedule showing the steps it will take to establish and enforce an inspection and maintenance program pursuant to paragraph (c) of this section.
 
 
 169
 S 52.491 Bicycle lanes and bicycle storage facilities.
 
 
 170
 (a) Definitions:
 
 
 171
 (1) "Bicycle" means a two-wheel, nonmotor powered vehicle.
 
 
 172
 (2) "Bicycle lane" means a route for the exclusive use of bicycles, either constructed specifically for that purpose or converted from an existing lane.
 
 
 173
 (3) "Bicycle parking facility" means any storage facility for bicycles, which allows bicycles to be locked securely.
 
 
 174
 (4) "Parking space" means the area allocated by a parking facility for the temporary storage of one automobile.
 
 
 175
 (5) "Parking facility" means a lot, garage, building, or portion thereof, in or on which motor vehicles are temporarily parked.
 
 
 176
 (b) This section shall be applicable in the District of Columbia portion of the National Capital Interstate Air Quality Control Region.
 
 
 177
 (c) On or before July 1, 1976, the District of Columbia shall establish a network of bicycle lanes linking residential areas with employment, educational, and commercial centers in accordance with the following requirements:
 
 
 178
 (1) The network shall contain no less than 60 miles of bicycle lanes in addition to any in existence as of November 20, 1973.
 
 
 179
 (2) Each bicycle lane shall at a minimum:
 
 
 180
 (i) Be clearly marked by signs indicating that the lane is for the exclusive use of bicycles (and pedestrians, if necessary);
 
 
 181
 (ii) Be separated from motor vehicle traffic by appropriate devices, such as physical barriers, pylons, or painted lines;
 
 
 182
 (iii) Be regularly maintained and repaired;
 
 
 183
 (iv) Be of a hard, smooth surface suitable for bicycles;
 
 
 184
 (v) Be at least 5 feet wide for one-way traffic, or 8 feet wide for two-way traffic;
 
 
 185
 (vi) If in a street used by motor vehicles, be a minimum of 8 feet wide whether one-way or two-way; and
 
 
 186
 (vii) Be adequately lighted.
 
 
 187
 (3) Off-street bicycle lanes which are not reasonably suited for commuting to and from employment, educational, and commercial centers shall not be considered a part of this network.
 
 
 188
 (4) On or before October 1, 1974, the District of Columbia shall establish 25 percent of the total mileage of the bicycle lane network; on or before June 1, 1975, 50 percent of the total mileage shall be established; on or before July 1, 1976, 100 percent of the total mileage shall be established.
 
 
 189
 (d) On or before June 1, 1974, the District of Columbia shall submit to the Administrator a comprehensive study of a bicycle lane and bicycle path network. The study shall include, but not be limited to the following:
 
 
 190
 (1) A bicycle user and potential user survey, which shall at a minimum determine:
 
 
 191
 (i) For present bicycle riders, the origin, destination, frequency, travel time, and distance of bicycle trips;
 
 
 192
 (ii) In high density employment areas, the present modes of transportation of employees and the potential modes of transportation, including the number of employees who would convert to the bicycle mode from other modes upon completion of the bicycle lane network described in paragraph (c) of this section.
 
 
 193
 (2) A determination of the feasibility and location of on-street bicycle lanes.
 
 
 194
 (3) A determination of the feasibility and location of off-street lanes.
 
 
 195
 (4) A determination of the special problems related to feeder lanes to bridges, on-bridge lanes, feeder lanes to METRO and railroad stations, and feeder lanes to fringe parking areas, and the means necessary to include such lanes in the bicycle lane network described in paragraph (c) of this section.
 
 
 196
 (5) A determination of the feasibility and location of various methods of safe bicycle parking.
 
 
 197
 (6) The study shall make provision for the receipt of public comments on any matter within the scope of the study, including the location of the bicycle lane network described in paragraph (c) of this section.
 
 
 198
 (e) By June 1, 1974, in addition to the comprehensive study required pursuant to paragraph (d) of this section, the District of Columbia shall submit to the Administrator a detailed compliance schedule showing the steps it will take to establish this network pursuant to paragraphs (c) and (h) of this section. The compliance schedule shall identify in detail the names of streets that will provide bicycle lanes and the location of any lanes to be constructed especially for bicycle use. It shall also include a statement indicating the source, amount, and adequacy of funds to be used in implementing this section, and the text of any needed statutory proposals and needed regulations which will be proposed for adoption.
 
 
 199
 (f) On or before October 1, 1974, the District of Columbia shall submit to the Administrator legally adopted regulations sufficient to implement and enforce all of the requirements of this section.
 
 
 200
 (g) On or before May 1, 1974, the District of Columbia shall establish a pilot bicycle lane from Key Bridge via Pennsylvania Avenue past the White House to the U.S. Capitol and from the Capitol along Pennsylvania Avenue to Alabama Avenue SE.
 
 
 201
 (h) On or before June 1, 1975, the District of Columbia shall require all owners and operators of parking facilities containing more than 50 parking spaces (including both free and commercial facilities) within the area specified in paragraph (b) of this section to provide spaces for the storage of bicycles in the following ratio: one automobile-sized parking space (with a bicycle parking facility) for the storage of bicycles for every 75 parking spaces for the storage of autos. The District shall also require that:
 
 
 202
 (1) Bicycle parking facilities shall be so located as to be safe from motor vehicle traffic and secure from theft. They shall be properly repaired and maintained.
 
 
 203
 (2) The METRO Subway System shall provide a sufficient number of safe and secure bicycle parking facilities at each station to meet the needs of its riders.
 
 
 204
 (3) All parking facilities owned, operated, or leased by the Federal Government shall be subject to this paragraph.
 
 
 205
 (4) Any owner or operator of a parking facility which charges a fee for the storage of motor vehicles shall store bicycles at a price per unit per hour which is no greater in relation to the cost of storing them than is the price of parking for a motor vehicle in relation to the cost of storing it. Unless the owner or operator makes an affirmative showing to the District of Columbia of different facts, and agrees to charge in conformity with that showing, the ratio in costs and prices shall be determined by the maximum number of bicycles that can be stored in a single standard-sized automobile parking space.
 
 
 206
 S 52.492 Medium duty air/fuel control retrofit.
 
 
 207
 (a) Definitions:
 
 
 208
 (1) "Air/fuel Control Retrofit" means a system or device (such as modification to the engine's carburetor or positive crankcase ventilation system) that results in engine operation at an increased air fuel ratio so as to achieve reduction in exhaust emissions of hydrocarbon and carbon monoxide from 1973 and earlier medium-duty vehicles of at least 15 and 30 percent, respectively.
 
 
 209
 (2) "Medium-duty vehicle" means a gasoline powered motor vehicle rated at more than 6,000 lb GVW and less than 10,000 lb GVW.
 
 
 210
 (3) All other terms used in this section that are defined in Part 51. Appendix N, of this chapter are used herein with meanings so defined.
 
 
 211
 (b) This section is applicable within the District of Columbia portion of the National Capital Interstate AQCR.
 
 
 212
 (c) The District of Columbia shall establish a retrofit program to ensure that on or before May 31, 1976, all medium-duty vehicles of model years prior to 1973 which are not required to be retrofitted with an oxidizing catalyst or other approved device pursuant to § 52.495 which are registered in the area specified in paragraph (b) of this section, are equipped with an appropriate air/fuel control device or other device as approved by the Administrator that will reduce exhaust emissions of hydrocarbons and carbon monoxide to the same extent as an air/fuel control device. No later than February 1, 1974, the District of Columbia shall submit to the Administrator a detailed compliance schedule showing the steps it will take to establish and enforce a retrofit program pursuant to this section. The compliance schedule shall include a date by which the District shall evaluate and approve devices for use in this program. Such date shall be no later than September 30, 1974.
 
 
 213
 (d) No later than April 1, 1974, the District shall submit legally adopted regulations to the Administrator establishing such a program. The regulations shall include:
 
 
 214
 (1) Designation of an agency responsible for evaluating and approving devices for use on vehicles subject to this section.
 
 
 215
 (2) Designation of an agency responsible for ensuring that the provisions of paragraph (d)(3) of this section are enforced.
 
 
 216
 (3) Provisions for beginning the installation of the retrofit devices by August 1, 1975, and completing the installation of the devices on all vehicles subject to this section no later than May 31, 1976.
 
 
 217
 (4) A provision that no later than May 31, 1976, no vehicle for which retrofit is required under this section shall pass the annual emission tests provided for by § 52.490 unless it has been first equipped with an approved air/fuel control device, or other device approved pursuant to this section, which the test has shown to be installed and operating correctly. The regulations shall include test procedures and failure criteria for implementing this provision.
 
 
 218
 (5) Methods and procedures for ensuring that those installing the retrofit devices have the training and ability to perform the needed tasks satisfactorily and have an adequate supply of retrofit components.
 
 
 219
 (6) Provision (apart from the requirements of any general program for periodic inspection and maintenance of vehicles) for emission testing at the time of device installation or some other positive assurance that the device is installed and operating correctly.
 
 
 220
 (e) After May 31, 1976, the District shall not register or allow to operate on its streets or highways any vehicle that does not comply with the applicable standards and procedures adopted pursuant to paragraph (d) of this section.
 
 
 221
 (f) After May 31, 1976, no owner of a vehicle subject to this section shall operate or allow the operation of any such vehicle that does not comply with the applicable standards and procedures implemented by this section.
 
 
 222
 (g) The District may exempt any class or category of vehicles from this section which the District finds is rarely used on public streets and highways (such as classic or antique vehicles) or for which the District demonstrates to the Administrator that air/fuel control devices or other devices approved pursuant to this section are not commercially available.S 52.494 Heavy duty air/fuel control retrofit
 
 
 223
 (a) Definitions:
 
 
 224
 (1) "Air/Fuel Control Retrofit" means a system or device (such as modification to the engine's carburetor or positive crankcase ventilation system) that results in engine operation at an increased air/fuel ratio so as to achieve reduction in exhaust emissions of hydrocarbon and carbon monoxide from heavy-duty vehicles of at least 30 and 40 percent, respectively.
 
 
 225
 (2) "Heavy-duty vehicle" means a gasoline-powered motor vehicle rated at 10,000 lb gross vehicle weight (GVW) or more.
 
 
 226
 (3) All other terms used in this section that are defined in Part 51, Appendix N, of this chapter are used herein with meanings so defined.
 
 
 227
 (b) This section is applicable within the District of Columbia portion of the National Capital Interstate AQCR.
 
 
 228
 (c) The District of Columbia shall establish a retrofit program to ensure that on or before May 31, 1977, all heavy-duty vehicles registered in the area specified in paragraph (b) of this section are equipped with an appropriate air/fuel control device, or other device as approved by the Administrator that will reduce exhaust emissions of hydrocarbons and carbon monoxide to the same extent as an air/fuel control device. No later than April 1, 1974, the District of Columbia shall submit to the Administrator a detailed compliance schedule showing the steps it will take to establish and enforce a retrofit program pursuant to this section. The compliance schedule shall include a date by which the District shall evaluate and approve devices for use in this program. Such date shall be no later than January 1, 1975.
 
 
 229
 (d) No later than September 1, 1974, the District shall submit legally adopted regulations to the Administrator establishing such a program. The regulations shall include:
 
 
 230
 (1) Designation of an agency responsible for evaluating and approving devices for use on vehicles subject to this section.
 
 
 231
 (2) Designation of an agency responsible for ensuring that the provisions of paragraph (d) (3) of this section are enforced.
 
 
 232
 (3) Provisions for beginning the installation of the retrofit devices by January 1, 1976, and completing the installation of the devices on all vehicles subject to this section no later than May 31, 1977.
 
 
 233
 (4) A provision that starting no later than May 31, 1977, no vehicle for which retrofit is required under this section shall pass the annual emission tests provided for by § 52.490 unless it has been first equipped with an approved air/fuel control device, or other device approved pursuant to this section, which the test has shown to be installed and operating correctly. The regulations shall include test procedures and failure criteria for implementing this provision.
 
 
 234
 (5) Methods and procedures for insuring that those installing the retrofit devices have the training and ability to perform the needed tasks satisfactorily and have an adequate supply of retrofit components.
 
 
 235
 (6) Provision (apart from the requirements of any general program for periodic inspection and maintenance of vehicles) for emissions testing at the time of device installation or some other positive assurance that the device is installed and operating correctly.
 
 
 236
 (e) After May 31, 1977, the District shall not register or allow to operate on its streets or highways any vehicle that does not comply with the applicable standards and procedures adopted pursuant to paragraph (d) of this section.
 
 
 237
 (f) After May 31, 1977, no owner of a vehicle subject to this section shall operate or allow the operation of any such vehicle that does not comply with the applicable standards and procedures implementing this section.
 
 
 238
 (g) The District may exempt any class or category of vehicles from this section which the District finds is rarely used on public streets and highways (such as classic or antique vehicles) or for which the District demonstrates to the Administrator that air/fuel control or other devices approved pursuant to this section are not commercially available.
 
 
 239
 S 52.495 Oxidizing catalyst retrofit.
 
 
 240
 (a) Definitions:
 
 
 241
 (1) "Oxidizing catalyst" means a device that uses a catalyst installed in the exhaust system of a vehicle (and if necessary includes an air pump) so as to achieve a reduction in exhaust emissions of hydrocarbon and carbon monoxide of at least 50 and 50 percent, respectively, from light-duty vehicles of 1971 through 1975 model years, and of at least 50 and 50 percent, respectively, from medium duty vehicles of 1971 through 1975 model years.
 
 
 242
 (2) "Light-duty vehicle" means a gasoline-powered motor vehicle rated at 6,000 lb gross vehicle weight (GVW) or less.
 
 
 243
 (3) "Medium-duty vehicle" means a gasoline-powered motor vehicle rated at more than 6,000 lb GVW and less than 10,000 lb GVW.
 
 
 244
 (4) "Fleet vehicle" means any of 5 or more light-duty vehicles operated by the same person(s), business, or governmental entity and used principally in connection with the same or related occupations or uses. This definition shall also include any taxicab (or other light-duty vehicle-for-hire) owned by any individual or business.
 
 
 245
 (5) All other terms used in this section that are defined in Part 51, Appendix N, are used herein with meanings so defined.
 
 
 246
 (b) This section is applicable within the District of Columbia portion of the National Capital Interstate AQCR.
 
 
 247
 (c) The District of Columbia shall establish a retrofit program to ensure that on or before May 31, 1977, all light-duty fleet vehicles of model years 1971 through 1975 and all medium-duty vehicles of model years 1971 through 1975 which are registered in the area specified in paragraph (b) of this section and are able to operate on 91RON gasoline are equipped with an appropriate oxidizing catalyst retrofit device or other device, as approved by the Administrator, that will reduce exhaust emissions of hydrocarbon and carbon monoxide to the same extent as an oxidizing catalyst retrofit device. No later than April 1, 1974, the District of Columbia shall submit to the Administrator a detailed compliance schedule showing the steps it will take to establish and enforce a retrofit program pursuant to this section. The compliance schedule shall include a date by which the District shall evaluate and approve devices for use in this program. Such date shall be no later than January 1, 1975.
 
 
 248
 (d) No later than September 1, 1974, the District shall submit legally adopted regulations to the Administrator establishing such a program.
 
 The regulations shall include:
 
 249
 (1) Designation of an agency responsible for evaluating and approving devices for use on vehicles subject to this section.
 
 
 250
 (2) Designation of an agency responsible for ensuring that the provisions of paragraph (d)(3) of this section are enforced.
 
 
 251
 (3) Provisions for beginning the installation of the retrofit devices by January 1, 1976, and completing the installation of the devices on all vehicles subject to this section no later than May 31, 1977.
 
 
 252
 (4) A provision that starting no later than May 31, 1977, no vehicle for which retrofit is required under this section shall pass the annual emission tests provided for by §§ 52.472 and 52.490 unless it has been first equipped with an approved oxidizing catalyst device, or other device approved pursuant to this section, which the test has shown to be installed and operating correctly. The regulations shall include test procedures and failure criteria for implementing this provision.
 
 
 253
 (5) Methods and procedures for ensuring that those installing the retrofit devices have the training and ability to perform the needed tasks satisfactorily and have an adequate supply of retrofit components.
 
 
 254
 (6) Provision (apart from the requirements of any general program for periodic inspection and maintenance of vehicles) for emissions testing at the time of device installation or some other positive assurance that the device is installed and operating correctly.
 
 
 255
 (e) After May 31, 1977, the District shall not register or allow to operate on its streets or highways any vehicle that does not comply with the applicable standards and procedures adopted pursuant to paragraph (d) of this section.
 
 
 256
 (f) After May 31, 1977, no owner of a vehicle subject to this section shall operate or allow the operation of any such vehicle that does not comply with the applicable standards and procedures implementing this section.
 
 
 257
 (g) Any vehicle which is manufactured equipped with an oxidizing catalyst, or which is certified to meet the original 1975 light duty vehicle emissions standards set forth in section 202(b)(1)(a) of the Clean Air Act of 1970 (without regard to any suspension of such standards), shall be exempt from the requirements of this section.
 
 
 258
 S 52.496 Vacuum spark advance disconnect retrofit.
 
 
 259
 (a) Definitions:
 
 
 260
 (1) "Vacuum spark advance disconnect retrofit" means a device or system installed on a motor vehicle that prevents the ignition vacuum, advance from operating either when the vehicle's transmission is in the lower gears, or when the vehicle is traveling below a predetermined speed, so as to achieve reduction in exhaust emissions of hydrocarbon and carbon monoxide from 1967 and earlier light-duty vehicles of at least 25 and 9 percent, respectively.
 
 
 261
 (2) "Light-duty vehicle" means a gasoline-powered motor vehicle rated at 6,000 lb gross vehicle weight (GVW) or less.
 
 
 262
 (3) All other terms used in this section that are defined in Part 51, Appendix N, are used herein with meanings so defined.
 
 
 263
 (b) This section is applicable within the District of Columbia portion of the National Capital Interstate AQCR.
 
 
 264
 (c) The District of Columbia shall establish a retrofit program to ensure that on or before January 1, 1976, all light-duty vehicles of model years prior to 1968 registered in the area specified in paragraph (b) of this section are equipped with an appropriate vacuum spark advance disconnect retrofit device or other device, as approved by the Administrator, that will reduce exhaust emissions of hydrocarbons and carbon monoxide to the same extent as a vacuum spark advance disconnect retrofit. No later than February 1, 1974, the District shall submit to the Administrator a detailed compliance schedule showing the steps it will take to establish and enforce a retrofit program pursuant to this section. The compliance schedule shall include a date by which the District shall evaluate and approve devices for use in this program. Such date shall be no later than September 30, 1974.
 
 
 265
 (d) No later than April 1, 1974, the District shall submit legally adopted regulations to the Administrator establishing such a program. The regulations shall include:
 
 
 266
 (1) Designation of an agency responsible for evaluating and approving devices for use on vehicles subject to this section.
 
 
 267
 (2) Designation of an agency responsible for ensuring that the provisions of paragraph (d)(3) of this section are enforced.
 
 
 268
 (3) Provisions for beginning the installation of the retrofit devices by January 1, 1975, and completing the installation of the devices on all vehicles subject to this section no later than January 1, 1976.
 
 
 269
 (4) A provision that starting no later than January 1, 1976, no vehicle for which retrofit is required under this section shall pass the annual emission tests provided for by § 52.472 unless it has been first equipped with an approved vacuum spark advance disconnect retrofit device, or other device approved pursuant to this section, which the test has shown to be installed and operating correctly. The regulations shall include test procedures and failure criteria for implementing this provision.
 
 
 270
 (5) Methods and procedures for ensuring that those installing the retrofit devices have the training and ability to perform the needed tasks satisfactorily and have an adequate supply of retrofit components.
 
 
 271
 (6) Provision (apart from the requirements of any general program for periodic inspection and maintenance of vehicles) for emissions testing at the time of device installation, or some other positive assurance that the device is installed and operating correctly.
 
 
 272
 (e) After January 1, 1976, the District shall not register or allow to operate on its streets or highways any light-duty vehicle that does not comply with the applicable standards and procedures adopted pursuant to paragraph (d) of this section.
 
 
 273
 (f) After January 1, 1976, no owner of a vehicle subject to this section shall operate or allow the operation of any such vehicle that does not comply with the applicable standards and procedures implementing this section.
 
 
 274
 (g) The District may exempt any class or category of vehicles from this section which the District finds is rarely used on public streets and highways (such as classic or antique vehicles) or for which the State demonstrates to the Administrator that vacuum spark advance disconnect devices or other devices approved pursuant to this section are not commercially available.
 
 Subpart V Maryland
 
 275
 S 52.1080 Compliance schedule.
 
 
 276
 (g) With respect to the measure for increased bus fleet and service approved in § 52.1073: The State of Maryland shall no later than January 31, 1974, submit a compliance schedule to put the program into effect. The compliance schedule shall, at a minimum, provide that the State of Maryland shall, on or before March 1, 1974, submit to the Administrator a statement, signed both by a representative of the State of Maryland, and by a representative of the Washington Metropolitan Area Transit Authority (WMATA) indicating that, in the judgment of both of them, financial commitments have been made by the State of Maryland or by its local governments for the purchase of buses. This statement, when taken in conjunction with the commitments made by the District of Columbia and the Commonwealth of Virginia, must be sufficient to enable WMATA to purchase in the fiscal year beginning the next July 1 the number of buses indicated below:
 
 Fiscal Year 1975 175 buses
 Fiscal Year 1976 150 buses
 Fiscal Year 1977 150 buses
 
 277
 The statement shall also indicate that WMATA has in fact committed to purchase that number of buses.
 
 
 278
 (h) With respect to the express bus lane measure approved in § 52.1073:
 
 
 279
 (1) The State of Maryland shall no later than January 1, 1975, establish exclusive bus lanes in the following corridors:
 
 
 280
 (i) U.S. Route 50 from New Carrollton to the Maryland-District of Columbia boundary.
 
 
 281
 (ii) Pennsylvania Avenue and Maryland Route 4 from Andrews Air Force Base to the Maryland-District of Columbia boundary.
 
 
 282
 (iii) U.S. Route 240 from Old Georgetown Road to the Maryland-District of Columbia boundary.
 
 
 283
 (iv) New Hampshire Avenue from U.S. Route 29 to the Maryland-District of Columbia boundary.
 
 
 284
 Such lanes shall be inbound during the morning peak and outbound during the evening peak periods.
 
 
 285
 (2) The State of Maryland shall submit to the Administrator, no later than March 1, 1974, a schedule showing the steps which it will take to establish exclusive bus lanes in those corridors enumerated in paragraph (h)(1) of this section. Each schedule shall be subject to approval by the Administrator and shall include as a minimum the following:
 
 
 286
 (i) Identification of streets or highways that shall have portions designated for exclusive bus lanes.
 
 
 287
 (ii) The date by which each street or highway shall be designated.
 
 
 288
 (3) Exclusive bus lanes must be prominently indicated by distinctively painted lines, pylons, overhead signs, or physical barriers.
 
 
 289
 (4) Application for substitution of a corridor for any of those listed in paragraph (h)(1) of this section shall be made by the State of Maryland for the Administrator's approval no later than March 1, 1974.
 
 
 290
 S 52.1089 Inspection and maintenance program.
 
 
 291
 (a) Definitions:
 
 
 292
 (1) "Inspection and maintenance program" means a program for reducing emissions from in-use vehicles through identifying vehicles that need emission control-related maintenance and requiring that such maintenance be performed.
 
 
 293
 (2) "Light-duty vehicle" means a gasoline-powered motor vehicle rated at 6,000 lb gross vehicle weight (GVW) or less.
 
 
 294
 (3) "Medium-duty vehicle" means a gasoline-powered motor vehicle rated at more than 6,000 lb GVW and less than 10,000 lb GVW.
 
 
 295
 (4) "Heavy-duty vehicle" means a gasoline-powered motor vehicle rated at 10,000 GVW or more.
 
 
 296
 (5) All other terms used in this section that are defined in Part 51, Appendix N, of this chapter are used herein with the meanings so defined.
 
 
 297
 (b) This section is applicable within the Maryland portion of the National Capital Interstate AQCR.
 
 
 298
 (c) The State of Maryland shall establish an inspection and maintenance program applicable to all light-duty, medium-duty, and heavy-duty vehicles registered in the area specified in paragraph (b) of this section that operate on public streets or highways over which it has ownership or control. The State may exempt any class or category of vehicles that the State finds is rarely used on public streets or highways (such as classic or antique vehicles). No later than April 1, 1974, the State shall submit legally adopted regulations to the Administrator establishing such a program. The regulations shall include:
 
 
 299
 (1) Provisions for inspection of all light-duty, medium-duty, and heavy-duty motor vehicles at periodic intervals, no more than 1 year apart by means of a leaded emission test.
 
 
 300
 (2) Provisions for inspection failure criteria consistent with the failure of 30 percent of the vehicles in the first inspection cycle.
 
 
 301
 (3) Provisions to ensure that failed vehicles receive within two weeks, the maintenance necessary to achieve compliance with the inspection standards. These shall include sanctions against individual owners and repair facilities, retest of failed vehicles following maintenance, use of a certification program to ensure that repair facilities performing the required maintenance have the necessary equipment, parts, and knowledgeable operators to perform the tasks satisfactorily, and use of such other measures as may be necessary or appropriate.
 
 
 302
 (4) A program of enforcement to ensure that vehicles are not intentionally readjusted or modified subsequent to the inspection and/or maintenance in such a way as would cause them to no longer comply with the inspection standards. This enforcement program might include spot checks of idle adjustments and/or a suitable type of physical tagging. This program shall include appropriate penalties for violation.
 
 
 303
 (5) Provisions for beginning the first inspection cycle by August 1, 1975, and completing it by July 31, 1976.
 
 
 304
 (6) Designation of an agency or agencies responsible for conducting, overseeing, and enforcing the inspection and maintenance program.
 
 
 305
 (d) After July 31, 1976, the State shall not register or allow to operate on public streets or highways any light-duty, medium-duty, or heavy-duty vehicle that does not comply with the applicable standards and procedures adopted pursuant to paragraph (c) of this section. This shall not apply to the initial registration of a new motor vehicle.
 
 
 306
 (e) After July 31, 1976, no owner of a light-duty, medium-duty, or heavy-duty vehicle shall operate or allow the operation of such vehicle that does not comply with the applicable standards and procedures adopted pursuant to paragraph (c) of this section. This shall not apply to the initial registration of a new motor vehicle.
 
 
 307
 (f) The State of Maryland shall submit, no later than February 1, 1974, a detailed compliance schedule showing the steps it will take to establish and enforce an inspection and maintenance program pursuant to paragraph (c) of this section, including:
 
 
 308
 (1) The text of needed statutory proposals and regulations that it will propose for adoption.
 
 
 309
 (2) The date by which the State will recommend needed legislation to the State legislature.
 
 
 310
 (3) The date by which necessary equipment will be ordered.
 
 
 311
 (4) A signed statement from the Governor or his designee identifying the sources and amounts of funds for the program. If funds cannot legally be obligated under existing statutory authority, the text of needed legislation shall be submitted.
 
 
 312
 S 52.1090 Bicycle lanes and bicycle storage facilities.
 
 
 313
 (a) Definitions:
 
 
 314
 (1) "Bicycle" means a two-wheel, non-motor powered vehicle.
 
 
 315
 (2) "Bicycle lane" means a route for the exclusive use of bicycles, either constructed specifically for that purpose or converted from an existing lane.
 
 
 316
 (3) "Bicycle parking facility" means any storage facility for bicycles, which allows bicycles to be locked securely.
 
 
 317
 (4) "Parking space" means the area allocated by a parking facility for the temporary storage of one automobile.
 
 
 318
 (5) "Parking facility" means a lot, garage, building, or portion thereof, in or on which motor vehicles are temporarily parked.
 
 
 319
 (b) This section shall be applicable in the State of Maryland portion of the National Capital Interstate Air Quality Control Region.
 
 
 320
 (c) On or before July 1, 1976, the State of Maryland shall establish a network of bicycle lanes linking residential areas with employment, educational, and commercial centers in accordance with the following requirements:
 
 
 321
 (1) The network shall contain no less than 60 miles of bicycle lanes in addition to any in existence as of November 20, 1973.
 
 
 322
 (2) Each bicycle lane shall at a minimum:
 
 
 323
 (i) Be clearly marked by signs indicating that the lane is for the exclusive use of bicycles (and pedestrians, if necessary);
 
 
 324
 (ii) Be separated from motor vehicle traffic by appropriate devices, such as physical barriers, pylons, or painted lines;
 
 
 325
 (iii) Be regularly maintained and repaired;
 
 
 326
 (iv) Be of a hard, smooth surface suitable for bicycles;
 
 
 327
 (v) Be at least 5 feet wide for one-way traffic, or 8 feet wide for two-way traffic;
 
 
 328
 (vi) If in a street used by motor vehicles, be a minimum of 8 feet wide whether one-way or two-way; and
 
 
 329
 (vii) Be adequately lighted.
 
 
 330
 (3) Off-street bicycle lanes which are not reasonably suited for commuting to and from employment, educational, and commercial centers shall not be considered a part of this network.
 
 
 331
 (4) On or before October 1, 1974, the State of Maryland shall establish 25 percent of the total mileage of the bicycle lane network; on or before June 1, 1975, 50 percent of the total mileage shall be established; on or before July 1, 1976, 100 percent of the total mileage shall be established.
 
 
 332
 (d) On or before June 1, 1974, the State of Maryland shall submit to the Administrator a comprehensive study of a bicycle lane and bicycle path network. The study shall include, but not be limited to the following:
 
 
 333
 (1) A bicycle user and potential user survey, which shall at a minimum determine:
 
 
 334
 (i) For present bicycle riders, the origin, destination, frequency, travel time, and distance of bicycle trips;
 
 
 335
 (ii) In high density employment areas, the present modes of transportation of employees and the potential modes of transportation, including the number of employees who would convert to the bicycle mode from other modes upon completion of the bicycle lane network described in paragraph (c) of this section.
 
 
 336
 (2) A determination of the feasibility and location of on-street bicycle lanes.
 
 
 337
 (3) A determination of the feasibility and location of off-street lanes.
 
 
 338
 (4) A determination of the special problems related to feeder lanes to bridges, on-bridge lanes, feeder lanes to METRO and railroad stations, and feeder lanes to fringe parking areas, and the means necessary to include such lanes in the bicycle lane network described in paragraph (c) of this section.
 
 
 339
 (5) A determination of the feasibility and location of various methods of safe bicycle parking.
 
 
 340
 (6) The study shall make provision for the receipt of public comments on any matter within the scope of the study, including the location of the bicycle lane network described in paragraph (c) of this section.
 
 
 341
 (e) By June 1, 1974, in addition to the comprehensive study required pursuant to paragraph (d) of this section, the State of Maryland shall submit to the Administrator a detailed compliance schedule showing the steps it will take to establish this network pursuant to paragraphs (c) and (g) of this section. The compliance schedule shall identify in detail the names of streets that will provide bicycle lanes and the location of any lanes to be constructed especially for bicycle use. It shall also include a statement indicating the source, amount, and adequacy of funds to be used in implementing this section, and the text of any needed statutory proposals and needed regulations which will be proposed for adoption.
 
 
 342
 (f) On or before October 1, 1974, the State of Maryland shall submit to the Administrator legally adopted regulations sufficient to implement and enforce all of the requirements of this section.
 
 
 343
 (g) On or before June 1, 1975, the State of Maryland shall require all owners and operators of parking facilities containing more than 50 parking spaces (including both free and commercial facilities) within the area specified in paragraph (b) of this section to provide spaces for the storage of bicycles in the following ratio: one automobile-sized parking space (with a bicycle parking facility) for the storage of bicycles for every 75 parking spaces for the storage of autos.
 
 
 344
 (1) Bicycle parking facilities shall be so located as to be safe from motor vehicle traffic and secure from theft. They shall be properly repaired and maintained.
 
 
 345
 (2) The METRO Subway System shall provide a sufficient number of safe and secure bicycle parking facilities at each station to meet the needs of its riders.
 
 
 346
 (3) All parking facilities owned, operated, or leased by the Federal Government shall be subject to this paragraph.
 
 
 347
 (4) Any owner or operator of a parking facility which charges a fee for the storage of motor vehicles shall store bicycles at a price per unit per hour which is no greater in relation to the cost of storing them than is the price of parking for a motor vehicle in relation to the cost of storing it. Unless the owner or operator makes an affirmative showing to the State of Maryland of different facts, and agrees to charge in conformity with that showing, the ratio in costs and prices shall be determined by the maximum number of bicycles that can be stored in a single standard-sized automobile parking space.
 
 
 348
 S 52.1091 Medium-duty air/fuel control retrofit.
 
 
 349
 (a) Definitions:
 
 
 350
 (1) "Air/Fuel Control Retrofit" means a system or device (such as modification to the engine's carburetor or positive crankcase ventilation system) that results in engine operation at an increased air/fuel ratio so as to achieve reduction in exhaust emissions of hydrocarbons and carbon monoxide from 1973 and earlier medium-duty vehicles of at least 15 and 30 percent, respectively.
 
 
 351
 (2) "Medium-duty vehicle" means a gasoline powered motor vehicle rated at more than 6,000 lb GVW and less than 10,000 lb GVW.
 
 
 352
 (3) All other terms used in this section that are defined in Part 51, Appendix N, of this chapter are used herein with meanings so defined.
 
 
 353
 (b) This section is applicable within the Maryland portion of the National Capital Interstate AQCR.
 
 
 354
 (c) The State of Maryland shall establish a retrofit program to ensure that on or before May 31, 1976, all medium-duty vehicles of model years prior to 1973 which are not required to be retrofitted with an oxidizing catalyst or other approved device pursuant to § 52.1093 of this chapter, which are registered in the area specified in paragraph (b) of this section, are equipped with an appropriate air/fuel control device or other device as approved by the Administrator that will reduce exhaust emissions of hydrocarbons and carbon monoxide to the same extent as an air/fuel control device. No later than February 1, 1974, the State of Maryland shall submit to the Administrator a detailed compliance schedule showing the steps it will take to establish and enforce a retrofit program pursuant to this section, including the text of statutory proposals, regulations, and enforcement procedures that the State proposes for adoption. The compliance schedule shall also include a date by which the State shall evaluate and approve devices for use in this program. Such date shall be no later than September 30, 1974.
 
 
 355
 (d) No later than April 1, 1974, the State shall submit legally adopted regulations to the Administrator establishing such a program. The regulations shall include:
 
 
 356
 (1) Designation of an agency responsible for evaluating and approving devices for use on vehicles subject to this section.
 
 
 357
 (2) Designation of any agency responsible for ensuring that the provisions of paragraph (d)(3) of this section are enforced.
 
 
 358
 (3) Provisions for beginning the installation of the retrofit devices by August 1, 1975, and completing the installation of the devices on all vehicles subject to this section no later than May 31, 1976.
 
 
 359
 (4) A provision that no later than May 31, 1976, no vehicle for which retrofit is required under this section shall pass the annual emission tests provided for by § 52.1089 unless it has been first equipped with an approved air/fuel control device, or other device approved pursuant to this section, which the test has shown to be installed and operating correctly. The regulations shall include test procedures and failure criteria for implementing this provision.
 
 
 360
 (5) Methods and procedures for ensuring that those persons installing the retrofit devices have the training and ability to perform the needed tasks satisfactorily and have an adequate supply of retrofit components.
 
 
 361
 (6) Provision (apart from the requirements of any general program for periodic inspection and maintenance of vehicles) for emissions testing at the time of device installation or some other positive assurance that the device is installed and operating correctly.
 
 
 362
 (e) After May 31, 1976, the State shall not register or allow to operate on its streets or highways any vehicle that does not comply with the applicable standards and procedures adopted pursuant to paragraph (d) of this section.
 
 
 363
 (f) After May 31, 1976, no owner of a vehicle subject to this section shall operate or allow the operation of any such vehicle that does not comply with the applicable standards and procedures implemented by this section.
 
 
 364
 (g) The State may exempt any class or category of vehicles from this section which the State finds is rarely used on public streets and highways (such as classic or antique vehicles) or for which the State demonstrates to the Administrator that air/fuel control devices or other devices approved pursuant to this section are not commercially available.
 
 
 365
 S 52.1092 Heavy-duty air/fuel control retrofit.
 
 
 366
 (a) Definitions:
 
 
 367
 (1) "Air/Fuel Control Retrofit" means a system or device (such as modification to the engine's carburetor or positive crankcase ventilation system) that results in engine operation at an increased air-fuel ratio so as to achieve reduction in exhaust emissions of hydrocarbon and carbon monoxide from heavy-duty vehicles of at least 30 and 40 percent, respectively.
 
 
 368
 (2) "Heavy-duty vehicle" means a gasoline-powered motor vehicle rated at 10,000 lb gross vehicle weight (GVW) or more.
 
 
 369
 (3) All other terms used in this section that are defined in Part 51, Appendix N, are used herein with meanings so defined.
 
 
 370
 (b) This section is applicable within the Maryland portion of the National Capital Interstate AQCR.
 
 
 371
 (c) The State of Maryland shall establish a retrofit program to ensure that on or before May 31, 1977, all heavy-duty vehicles registered in the areas specified in paragraph (b) of this section are equipped with an appropriate air/fuel control retrofit or other device as approved by the Administrator that will reduce exhaust emissions of hydrocarbons and carbon monoxide at least to the same extent as an air/fuel control retrofit. No later than April 1, 1974, the State of Maryland shall submit to the Administrator a detailed compliance schedule showing the steps it will take to establish and enforce a retrofit program pursuant to this section, including the text of statutory proposals, regulations, and enforcement procedures that the State proposes for adoption. The compliance schedule shall also include a date by which the State shall evaluate and approve devices for use in this program. Such date shall be no later than January 1, 1975.
 
 
 372
 (d) No later than September 1, 1974, the State shall submit legally adopted regulations to the Administrator establishing such a program. The regulations shall include:
 
 
 373
 (1) Designation of an agency responsible for evaluating and approving devices for use on vehicles subject to this section.
 
 
 374
 (2) Designation of an agency responsible for ensuring that the provisions of paragraph (d)(3) of this section are enforced.
 
 
 375
 (3) Provisions for beginning the installation of the retrofit devices by January 1, 1976, and completing the installation of the device on all vehicles subject to this section no later than May 31, 1977.
 
 
 376
 (4) A provision that starting no later than May 31, 1977, no vehicle for which retrofit is required under this section shall pass the annual emission tests provided for by § 52.1089 unless it has been first equipped with an approved air/fuel control retrofit, or other device approved pursuant to this section, which the test has shown to be installed and operating correctly. The regulations shall include test procedures and failure criteria for implementing this provision.
 
 
 377
 (5) Methods and procedures for ensuring that those installing the retrofit devices have the training and ability to perform the needed tasks satisfactorily and have an adequate supply of retrofit components.
 
 
 378
 (6) Provision (apart from the requirements of any general program for periodic inspection and maintenance of vehicles) for emissions testing at the time of device installation or some other positive assurance that the device is installed and operating correctly.
 
 
 379
 (e) After May 31, 1977, the State shall not register or allow to operate on its streets or highways any vehicle that does not comply with the applicable standards and procedures adopted pursuant to paragraph (d) of this section.
 
 
 380
 (f) After May 31, 1977, no owner of a vehicle subject to this section shall operate or allow the operation of any such vehicle that does not comply with the applicable standards and procedures implementing this section.
 
 
 381
 (g) The State may exempt any class or category of vehicles from this section which the State finds is rarely used on public streets and highways (such as classic or antique vehicles) or for which the State demonstrates to the Administrator that air/fuel control retrofits or other devices approved pursuant to this section are not commercially available.
 
 
 382
 S 52.1093 Oxidizing catalyst retrofit.
 
 
 383
 (a) Definitions:
 
 
 384
 (1) "Oxidizing catalyst" means a device that uses a catalyst installed in the exhaust system of a vehicle (and if necessary includes an air pump) so as to achieve a reduction in exhaust emissions of hydrocarbon and carbon monoxide of at least 50 and 50 percent, respectively, from light duty vehicles of 1971 through 1975 model years, and of at least 50 and 50 percent, respectively, from medium duty vehicles of 1971 through 1975 model years.
 
 
 385
 (2) "Light-duty vehicle" means a gasoline-powered motor vehicle rated at 6,000 lb gross vehicle weight (GVW) or less.
 
 
 386
 (3) "Medium-duty vehicle" means a gasoline-powered motor vehicle rated at more than 6,000 lb GVW and less than 10,000 lb GVW.
 
 
 387
 (4) "Fleet vehicle" means any of 5 or more light duty vehicles operated by the same person(s), business, or governmental entity and used principally in connection with the same or related occupations or uses. This definition shall also include any taxicab (or other light duty vehicle-for-hire) owned by any individual or business.
 
 
 388
 (5) All other terms used in this section that are defined in Part 51, Appendix N, of this chapter are used herein with meanings so defined.
 
 
 389
 (b) This section is applicable within the Maryland portion of the National Capital Interstate AQCR.
 
 
 390
 (c) The State of Maryland shall establish a retrofit program to ensure that on or before May 31, 1977, all light-duty fleet vehicles of model years 1971 through 1975, and all medium-duty vehicles of model years 1971 through 1975 which are registered in the area specified in paragraph (b) of this section and are able to operate on 91 RON gasoline are equipped with an appropriate oxidizing catalyst retrofit device, or other device, as approved by the Administrator, that will reduce exhaust emissions of hydrocarbons and carbon monoxide to the same extent as an oxidizing catalyst retrofit device. No later than April 1, 1974, the State of Maryland shall submit to the Administrator a detailed compliance schedule showing the steps it will take to establish and enforce a retrofit program pursuant to this section, including the text of statutory proposals, regulations, and enforcement procedures that the State proposes for adoption. The compliance schedule shall also include a date by which the State shall evaluate and approve devices for use in this program. Such data shall be no later than January 1, 1975.
 
 
 391
 (d) No later than September 1, 1974, the State shall submit legally adopted regulations to the Administrator establishing such a program. The regulations shall include:
 
 
 392
 (1) Designation of an agency responsible for evaluating and approving devices for use on vehicles subject to this section.
 
 
 393
 (2) Designation of an agency responsible for ensuring that the provisions of paragraph (d)(3) of this section are enforced.
 
 
 394
 (3) Provisions for beginning the installation of the retrofit devices by January 1, 1976, and for completing the installation of the devices on all vehicles subject to this section no later than May 31, 1977.
 
 
 395
 (4) A provision that starting no later than May 31, 1977, no vehicle for which retrofit is required under this section shall pass the annual emission tests provided for by § 52.1089 unless it has been first equipped with an approved oxidizing catalyst device, or other device approved pursuant to this section, which the test has shown to be installed and operating correctly. The regulations shall include test procedures and failure criteria for implementing this provision.
 
 
 396
 (5) Methods and procedures for ensuring that those installing the retrofit devices have the training and ability to perform the needed tasks satisfactorily and have an adequate supply of retrofit components.
 
 
 397
 (6) Provision (apart from the requirements of any general program for periodic inspection and maintenance of vehicles) for emissions testing at the time of device installation, or some other positive assurance that the device is installed and operating correctly.
 
 
 398
 (e) After May 31, 1977, the State shall not register or allow to operate on its streets or highways any vehicle that does not comply with the applicable standards and procedures adopted pursuant to paragraph (d) of this section.
 
 
 399
 (f) After May 31, 1977, no owner of a vehicle subject to this section shall operate or allow the operation of any such vehicle that does not comply with the applicable standards and procedures implementing this section.
 
 
 400
 (g) Any vehicle which is manufactured equipped with an oxidizing catalyst, or which is certified to meet the original 1975 light duty vehicle emissions standards set forth in section 202(b)(1)(a) of the Clean Air Act of 1970 (without regard to any suspension of such standards), shall be exempt from the requirements of this section.
 
 
 401
 S 52.1094 Vacuum spark advance disconnect retrofit.
 
 
 402
 (a) Definitions:
 
 
 403
 (1) "Vacuum spark advance disconnect retrofit" means a device or system installed on a motor vehicle that prevents the ignition vacuum advance from operating either when the vehicle's transmission is in the lower gears, or when the vehicle is traveling below a predetermined speed, so as to achieve reduction in exhaust emissions of hydrocarbon and carbon monoxide from 1967 and earlier light-duty vehicles of at least 25 and 9 percent, respectively.
 
 
 404
 (2) "Light-duty vehicle" means a gasoline-powered motor vehicle rated at 6,000 lb gross vehicle weight (GVW) or less.
 
 
 405
 (3) All other terms used in this section that are defined in Part 51, Appendix N, of this chapter are used herein with meanings so defined.
 
 
 406
 (b) This section is applicable within the Maryland portion of the National Capital Interstate AQCR.
 
 
 407
 (c) The State of Maryland shall establish a retrofit program to ensure that on or before January 1, 1976, all light-duty vehicles of model years prior to 1968 registered in the area specified in paragraph (b) of this section are equipped with an appropriate vacuum spark advance disconnect retrofit device or other device, as approved by the Administrator, that will reduce exhaust emissions of hydrocarbons and carbon monoxide at least to the same extent as a vacuum spark advance disconnect retrofit. No later than February 1, 1974, the State of Maryland shall submit to the Administrator a detailed compliance schedule showing the steps it will take to establish and enforce a retrofit program pursuant to this section, including the text of statutory proposals, regulations, and enforcement procedures that the State proposes for adoption. The compliance schedule shall also include a date by which the State shall evaluate and approve devices for use in this program. Such date shall be no later than September 30, 1974.
 
 
 408
 (d) No later than April 1, 1974, the State shall submit legally adopted regulations to the Administrator establishing such a program. The regulations shall include:
 
 
 409
 (1) Designation of an agency responsible for evaluating and approving devices for use on vehicles subject to this section.
 
 
 410
 (2) Designation of an agency responsible for ensuring that the provisions of paragraph (d)(3) of this section are enforced.
 
 
 411
 (3) Provisions for beginning the installation of the retrofit devices by January 1, 1975, and completing the installation of the devices on all vehicles subject to this section no later than January 1, 1976.
 
 
 412
 (4) A provision that starting no later than January 1, 1976, no vehicle for which retrofit is required under this section shall pass the annual emission tests provided for § 52.1089 unless it has been first equipped with an approved vacuum spark advance disconnect retrofit device, or other device approved pursuant to this section, which the test has shown to be installed and operating correctly. The regulations shall include test procedures and failure criteria for implementing this provision.
 
 
 413
 (5) Methods and procedures for ensuring that those installing the retrofit devices have the training and ability to perform the needed tasks satisfactorily and have an adequate supply of retrofit components.
 
 
 414
 (6) Provision (apart from the requirements of any general program for periodic inspection and maintenance of vehicles) for emissions testing at the time of device installation or some other positive assurance that the device is installed and operating correctly.
 
 
 415
 (e) After January 1, 1976 the State shall not register or allow to operate on its streets or highways any light-duty vehicle that does not comply with the applicable standards and procedures adopted pursuant to paragraph (d) of this section.
 
 
 416
 (f) After January 1, 1976, no owner of a vehicle subject to this section shall operate or allow the operation of any such vehicle that does not comply with the applicable standards and procedures implementing this section.
 
 
 417
 (g) The State may exempt any class or category of vehicles from this section which the State finds is rarely used on public streets and highways (such as classic or antique vehicles) or for which the State demonstrates to the Administrator that vacuum spark advance disconnect devices or other devices approved pursuant to this section are not commercially available.
 
 Subpart VV Virginia
 
 418
 S 52.2435 Compliance schedules.
 
 
 419
 (e) With respect to the measure for increased bus fleet and service approved in § 52.2423. The Commonwealth of Virginia shall no later than January 31, 1974, submit a compliance schedule to put the program in effect. The compliance schedule shall, at a minimum, provide that the Commonwealth of Virginia shall, on or before March 1, 1974, submit to the Administrator a statement, signed both by a representative of the Commonwealth of Virginia and by a representative of the Washington Metropolitan Area Transit Authority (WMATA) indicating that, in the judgment of both of them, financial commitments have been made by the Commonwealth of Virginia or by its local governments for the purchase of buses. This statement, when taken in conjunction with the commitments made by the District of Columbia and the State of Maryland must be sufficient to enable WMATA to purchase in the fiscal year beginning the next July 1 the number of buses indicated below:
 
 Fiscal Year 1975 175 buses
 Fiscal Year 1976 150 buses
 Fiscal Year 1977 150 buses
 
 420
 The statement shall also indicate that WMATA has in fact committed to purchase that number of buses.
 
 
 421
 (f) With respect to the express bus lane measure approved in § 52.2423:
 
 
 422
 (1) The Commonwealth of Virginia shall no later than January 1, 1975, establish exclusive bus lanes in the following corridors:
 
 
 423
 (i) George Washington Parkway Washington Street Jefferson Davis Highway from Fort Hunt to National Airport.
 
 
 424
 (ii) U.S. Route 50 from Seven Corners to the Virginia-District of Columbia boundary.
 
 
 425
 Such lanes shall be inbound during the morning peak period and outbound during the evening peak period.
 
 
 426
 (2) The Commonwealth of Virginia shall submit to the Administrator, no later than March 1, 1974, a schedule showing the steps which it will take to establish exclusive bus lanes in those corridors enumerated in paragraph (f)(1) of this section. Each schedule shall be subject to approval by the Administrator and shall include as a minimum the following:
 
 
 427
 (i) Identification of streets or highways that shall have portions designated for exclusive bus lanes.
 
 
 428
 (ii) The date by which each street or highway shall be designated.
 
 
 429
 (3) Exclusive bus lanes must be prominently indicated by distinctively painted lines, pylons, overhead signs, or physical barriers.
 
 
 430
 (4) Application for substitution of a corridor for any of those listed in paragraph (f)(1) of this section shall be made by the Commonwealth of Virginia for the Administrator's approval no later than March 1, 1974.
 
 
 431
 S 52.2441 Inspection and maintenance program.
 
 
 432
 (a) Definitions:
 
 
 433
 (1) "Inspection and maintenance program" means a program for reducing emissions from in-use vehicles through identifying vehicles that need emission control related maintenance and requiring that such maintenance be performed.
 
 
 434
 (2) "Light-duty vehicle" means a gasoline-powered motor vehicle rated at 6,000 lb gross vehicle weight (GVW) or less.
 
 
 435
 (3) "Medium-duty vehicle" means a gasoline-powered motor vehicle rated at more than 6,000 lb GVW and less than 10,000 lb GVW.
 
 
 436
 (4) "Heavy-duty vehicle" means a gasoline-powered motor vehicle rated at 10,000 lb GVW or more.
 
 
 437
 (5) All other terms used in this section that are defined in Part 51, Appendix N, are used herein with the meanings so defined.
 
 
 438
 (b) This section is applicable within the Virginia portion of the National Capital Interstate AQCR.
 
 
 439
 (c) In connection with the light-duty vehicle inspection and maintenance program for the area specified in paragraph (b) of this section approved by the Administrator pursuant to § 52.2423, the Commonwealth of Virginia shall establish an inspection and maintenance program applicable to all medium-duty and heavy-duty vehicles registered in any area specified in paragraph (b) of this section that operate on public streets or highways over which it has ownership or control. The Commonwealth may exempt any class or category of vehicles that the Commonwealth finds is rarely used on public streets or highways (such as classic or antique vehicles). No later than April 1, 1974, the Commonwealth shall submit legally adopted regulations to the Administrator establishing such a program. The regulations shall include:(1) Provisions for inspection of all medium-duty and heavy-duty motor vehicles at periodic intervals no more than 1 year apart by means of an idle emission test.
 
 
 440
 (2) Provisions for inspection failure criteria consistent with the failure of 30 percent of the vehicles in the first inspection cycle.
 
 
 441
 (3) Provisions to ensure that failed vehicles receive, within two weeks, the maintenance necessary to achieve compliance with the inspection standards. These shall include sanctions against individual owners and repair facilities, retest of failed vehicles following maintenance, use of a certification program to ensure that repair facilities performing the required maintenance have the necessary equipment, parts, and knowledgeable operators to perform the tasks satisfactorily, and use of such other measures as may be necessary or appropriate.
 
 
 442
 (4) A program of enforcement to ensure that vehicles are not intentionally readjusted or modified subsequent to the inspection and/or maintenance in such a way as would cause them to no longer comply with the inspection standards. This enforcement program might include spot checks of idle adjustments and/or a suitable type of physical tagging. This program shall include appropriate penalties for violation.
 
 
 443
 (5) Provisions for beginning the first inspection cycle by January 1, 1975, and completing it by January 1, 1976.
 
 
 444
 (6) Designation of an agency or agencies responsible for conducting, overseeing, and enforcing the inspection and maintenance program.
 
 
 445
 (d) After January 1, 1976, the Commonwealth shall not register or allow to operate on public streets or highways any medium-duty or heavy-duty vehicle that does not comply with the applicable standards and procedures adopted pursuant to paragraph (c) of this section. This shall not apply to the initial registration of a new motor vehicle.
 
 
 446
 (e) After January 1, 1976, no owner of a medium-duty or heavy-duty vehicle shall operate or allow the operation of such vehicle that does not comply with the applicable standards and procedures adopted pursuant to paragraph (c) of this section. This shall not apply to the initial registration of a new motor vehicle.
 
 
 447
 (f) The Commonwealth of Virginia shall submit, no later than February 1, 1974, a detailed compliance schedule showing the steps it will take to establish and enforce an inspection and maintenance program pursuant to paragraph (c) of this section, including:
 
 
 448
 (1) The text of needed statutory proposals and regulations that it will propose for adoption.
 
 
 449
 (2) The date by which the Commonwealth will recommend needed legislation to the legislature.
 
 
 450
 (3) The date by which necessary equipment will be ordered.
 
 
 451
 (4) A signed statement from the Governor or his designee identifying the sources and amounts of funds for the program. If funds cannot legally be obligated under existing statutory authority, the text of needed legislation shall be submitted.
 
 
 452
 S 52.2442 Bicycle lanes and bicycle storage facilities.
 
 
 453
 (a) Definitions:
 
 
 454
 (1) "Bicycle" means a two-wheel, non-motor powered vehicle.
 
 
 455
 (2) "Bicycle lane" means a route for the exclusive use of bicycles, either constructed specifically for that purpose or converted from an existing lane.
 
 
 456
 (3) "Bicycle parking facility" means any storage facility for bicycles, which allows bicycles to be locked securely.
 
 
 457
 (4) "Parking space" means the area allocated by a parking facility for the temporary storage of one automobile.
 
 
 458
 (5) "Parking facility" means a lot, garage, building or portion thereof, in or on which motor vehicles are temporarily parked.
 
 
 459
 (b) This section shall be applicable in the Commonwealth of Virginia portion of the National Capital Interstate Air Quality Control Region.
 
 
 460
 (c) On or before July 1, 1976, the Commonwealth of Virginia shall establish a network of bicycle lanes linking residential areas with employment, educational, and commercial centers in accordance with the following requirements:
 
 
 461
 (1) The network shall contain no less than 60 miles of bicycle lanes in addition to any in existence as of November 20, 1973.
 
 
 462
 (2) Each bicycle lane shall at a minimum:
 
 
 463
 (i) Be clearly marked by signs indicating that the lane is for the exclusive use of bicycles (and pedestrians, if necessary);
 
 
 464
 (ii) Be separated from motor vehicle traffic by appropriate devices, such as physical barriers, pylons, or painted lines;
 
 
 465
 (iii) Be regularly maintained and repaired;
 
 
 466
 (iv) Be of a hard, smooth surface suitable for bicycles;
 
 
 467
 (v) Be at least 5 feet wide for one-way traffic, or 8 feet wide for two-way traffic;
 
 
 468
 (vi) If in a street used by motor vehicles, be a minimum of 8 feet wide whether one-way or two-way; and
 
 
 469
 (vii) Be adequately lighted.
 
 
 470
 (3) Off-street bicycle lanes which are not reasonably suited for commuting to and from employment, educational, and commercial centers shall not be considered a part of this network.
 
 
 471
 (4) On or before October 1, 1974, the Commonwealth of Virginia shall establish 25 percent of the total mileage of the bicycle lane network: on or before June 1, 1975, 50 percent of the total mileage shall be established; on or before July 1, 1976, 100 percent of the total mileage shall be established.
 
 
 472
 (d) On or before June 1, 1974, the Commonwealth of Virginia shall submit to the Administrator a comprehensive study of a bicycle lane and bicycle path network. The study shall include, but not be limited to the following:
 
 
 473
 (1) A bicycle user and potential user survey, which shall at a minimum determine:
 
 
 474
 (i) For present bicycle riders, the origin, destination, frequency, travel time, and distance of bicycle trips;
 
 
 475
 (ii) In high density employment areas, the present modes of transportation of employees and the potential modes of transportation, including the number of employees who would convert to the bicycle mode from other modes upon completion of the bicycle lane network described in paragraph (c) of this section.
 
 
 476
 (2) A determination of the feasibility and location of on-street bicycle lanes.
 
 
 477
 (3) A determination of the feasibility and location of off-street lanes.
 
 
 478
 (4) A determination of the special problems related to feeder lanes to bridges, on-bridge lanes, feeder lanes to METRO and railroad stations, and feeder lanes to fringe parking areas, and the means necessary to include such lanes in the bicycle lane network described in paragraph (c) of this section.
 
 
 479
 (5) A determination of the feasibility and location of various methods of safe bicycle parking.
 
 
 480
 (6) The study shall make provision for the receipt of public comments on any matter within the scope of the study, including the location of the bicycle lane network described in paragraph (c) of this section.
 
 
 481
 (e) By June 1, 1974, in addition to the comprehensive study required pursuant to paragraph (d) of this section, the Commonwealth of Virginia shall submit to the Administrator a detailed compliance schedule showing the steps it will take to establish this network pursuant to paragraphs (c) and (g) of this section. The compliance schedule shall identify in detail the names of streets that will provide bicycle lanes and the location of any lanes to be constructed especially for bicycle use. It shall also include a statement indicating the source, amount, and adequacy of funds to be used in implementing this section, and the text of any needed statutory proposals and needed regulations which will be proposed for adoption.
 
 
 482
 (f) On or before October 1, 1974, the Commonwealth of Virginia shall submit to the Administrator legally adopted regulations sufficient to implement and enforce all of the requirements of this section.
 
 
 483
 (g) On or before June 1, 1975, the Commonwealth of Virginia shall require all owners and operators of parking facilities containing more than 50 parking spaces (including both free and commercial facilities) within the area specified in paragraph (b) of this section to provide spaces for the storage of bicycles in the following ratio: one automobile-size parking space (with a bicycle parking facility) for the storage of bicycles for every 75 parking spaces for the storage of autos. The Commonwealth shall also require that:
 
 
 484
 (1) Bicycle parking facilities shall be so located as to be safe from motor vehicle traffic and secure from theft. They shall be properly repaired and maintained.
 
 
 485
 (2) The METRO Subway System shall provide a sufficient number of safe and secure bicycle parking facilities at each station to meet the needs of its riders.
 
 
 486
 (3) All parking facilities owned, operated, or leased by the Federal Government shall be subject to this paragraph.
 
 
 487
 (4) Any owner or operator of a parking facility which charges a fee for the storage of motor vehicles shall store bicycles at a price per unit per hour which is no greater in relation to the cost of storing them than is the price of parking for a motor vehicle in relation to the cost of storing it. Unless the owner or operator makes an affirmative showing to the Commonwealth of Virginia of different facts, and agrees to charge in conformity with that showing, the ratio in costs and prices shall be determined by the maximum number of bicycles that can be stored in a single standard-sized automobile parking space.
 
 
 488
 S 52.2444 Medium duty air/fuel control retrofit.
 
 
 489
 (a) Definitions:
 
 
 490
 (1) "Air/Fuel Control Retrofit" means a system or device (such as modification to the engine's carburetor or positive crankcase ventilation system) that results in engine operation at an increased air-fuel ratio so as to achieve reductions in exhaust emissions of hydrocarbon and carbon monoxide from 1973 and earlier medium-duty vehicles of at least 15 and 30 percent, respectively.
 
 
 491
 (2) "Medium-duty vehicle" means a gasoline powered motor vehicle rated at more than 6,000 lb GVW and less than 10,000 lb GVW.
 
 
 492
 (3) All other terms used in this section that are defined in Part 51, Appendix N, of this chapter are used herein with meanings so defined.
 
 
 493
 (b) This section is applicable within the Virginia portion of the National Capital Interstate AQCR.
 
 
 494
 (c) The Commonwealth of Virginia shall establish a retrofit program to ensure that on or before May 31, 1976, all medium-duty vehicles of model years prior to 1973 which are not required to be retrofitted with an oxidizing catalyst or other approved device pursuant to § 52.2446, which are registered in the area specified in paragraph (b) of this section, are equipped with an appropriate Air/Fuel Control device or other device as approved by the Administrator that will reduce exhaust emissions of hydrocarbon and carbon monoxide to the same extent as an air/fuel control device. No later than February 1, 1974, the Commonwealth of Virginia shall submit to the Administrator a detailed compliance schedule showing the steps it will take to establish and enforce a retrofit program pursuant to this section, including the text of statutory proposals, regulations, and enforcement procedures that the Commonwealth proposes for adoption. The compliance schedule shall also include a date by which the Commonwealth shall evaluate and approve devices for use in this program. Such date shall be no later than September 30, 1974.
 
 
 495
 (d) No later than April 1, 1974, the Commonwealth shall submit legally adopted regulations to the Administrator establishing such a program. The regulations shall include:
 
 
 496
 (1) Designation of an agency responsible for evaluating and approving devices for use on vehicles subject to this section.
 
 
 497
 (2) Designation of an agency responsible for ensuring that the provisions of paragraph (d)(3) of this section are enforced.
 
 
 498
 (3) Provisions for beginning the installation of the devices by August 1, 1975, and completing the installation of the devices on all vehicles subject to this section no later than May 31, 1976.
 
 
 499
 (4) A provision that no later than May 31, 1976, no vehicle for which retrofit is required under this section shall pass the annual emission tests provided for by § 52.2441 unless it has been first equipped with an approved air/fuel control device or other device approved pursuant to this section, which the test has shown to be installed and operating correctly. The regulations shall include test procedures and failure criteria for implementing this provision.
 
 
 500
 (5) Methods and procedures for ensuring that those persons installing the retrofit device have the training and ability to perform the needed tasks satisfactorily and have an adequate supply of retrofit components.
 
 
 501
 (6) Provision (apart from the requirements of any general program for periodic inspection and maintenance of vehicles) for emissions testing at the time of device installation or some other positive assurance that the device is installed and operating correctly.
 
 
 502
 (e) After May 31, 1976, the Commonwealth shall not register or allow to operate on its streets or highways any vehicle that does not comply with the applicable standards and procedures adopted pursuant to paragraph (d) of this section.
 
 
 503
 (f) After May 31, 1976, no owner of a vehicle subject to this section shall operate or allow the operation of any such vehicle that does not comply with the applicable standards and procedures implemented by this section.
 
 
 504
 (g) The Commonwealth may exempt any class or category of vehicles from this section which the Commonwealth finds is rarely used on public streets and highways (such as classic or antique vehicles) or for which the Commonwealth demonstrates to the Administrator that air/fuel control devices or other devices approved pursuant to this section are not commercially available.
 
 
 505
 S 52.2445 Heavy duty air/fuel control retrofit.
 
 
 506
 (a) Definitions:
 
 
 507
 (1) "Air/Fuel Control Retrofit" means a system or device (such as modification to the engine's carburetor or positive crankcase ventilation system) that results in engine operation at an increased air/fuel ratio so as to achieve reduction in exhaust emissions of hydrocarbon and carbon monoxide from heavy-duty vehicles of at least 30 and 40 percent, respectively.
 
 
 508
 (2) "Heavy duty vehicle" means a gasoline-powered motor vehicle rated at 10,000 lb gross vehicle weight or more.
 
 
 509
 (3) All other terms used in this section that are defined in Part 51, Appendix N, of this chapter are used herein with meanings so defined.
 
 
 510
 (b) This section is applicable within the Virginia portion of the National Capital Interstate AQCR.
 
 
 511
 (c) The Commonwealth of Virginia shall establish a retrofit program to ensure that on or before May 31, 1977, all heavy duty vehicles registered in the area specified in paragraph (b) of this section are equipped with an appropriate air/fuel control device or other device as approved by the Administrator that will reduce exhaust emissions of hydrocarbons and carbon monoxide to the same extent as an air/fuel control device. No later than April 1, 1974, the Commonwealth of Virginia shall submit to the Administrator a detailed compliance schedule showing the steps it will take to establish and enforce a retrofit program pursuant to this section, including the text of statutory proposals, regulations, and enforcement procedures that the Commonwealth proposes for adoption. The compliance schedule shall also include a date by which the Commonwealth shall evaluate and approve devices for use in this program. Such date shall be no later than January 1, 1975.
 
 
 512
 (d) No later than September 1, 1974, the Commonwealth shall submit legally adopted regulations to the Administrator establishing such a program. The regulations shall include:
 
 
 513
 (1) Designation of an agency responsible for evaluating and approving devices for use on vehicles subject to this section.
 
 
 514
 (2) Designation of an agency responsible for ensuring that the provisions of paragraph (d)(3) of this section are enforced.
 
 
 515
 (3) Provisions for beginning the installation of the retrofit devices by January 1, 1976, and completing the installation of the devices on all vehicles subject to this section no later than May 31, 1977.
 
 
 516
 (4) A provision that starting no later than May 31, 1977, no vehicle for which retrofit is required under this section shall pass the annual emission tests provided for by § 52.2441 unless it has been first equipped with an approved air/fuel control device, or other device approved pursuant to this section, which the test has shown to be installed and operating correctly. The regulations shall include test procedures and failure criteria for implementing this provision.
 
 
 517
 (5) Methods and procedures for ensuring that those installing the retrofit devices have the training and ability to perform the needed tasks satisfactorily and have an adequate supply of retrofit components.
 
 
 518
 (6) Provision (apart from the requirements of any general program for periodic inspection and maintenance of vehicles) for emissions testing at the time of device installation or some other positive assurance that the device is installed and operating correctly.
 
 
 519
 (g) The Commonwealth may exempt any class or category of vehicles from this section which the Commonwealth finds is rarely used on public streets and highways (such as classic or antique vehicles) or for which the Commonwealth demonstrates to the Administrator that air/fuel control device or other devices approved pursuant to this section are not commercially available.
 
 
 520
 S 52.2446 Oxidizing catalyst retrofit.
 
 
 521
 (a) Definitions:
 
 
 522
 (1) "Oxidizing catalyst" means a device that uses a catalyst installed in the exhaust system of a vehicle (and if necessary includes an air pump) so as to achieve reduction in exhaust emissions of hydrocarbon and carbon monoxide of at least 50 and 50 percent, respectively, from light duty vehicles of 1971 through 1975 model years, and of at least 50 to 50 percent, respectively, from medium duty vehicles of 1971 through 1975 model years.
 
 
 523
 (2) "Light-duty vehicle" means a gasoline-powered motor vehicle rated at 6,000 lb gross vehicle weight (GVW) or less.
 
 
 524
 (3) "Medium-duty vehicle" means a gasoline-powered motor vehicle rated at more than 6,000 lb GVW and less than 10,000 lb GVW.
 
 
 525
 (4) "Fleet vehicle" means any of 5 or more light-duty vehicles operated by the same person(s), business, or governmental entity and used principally in connection with the same or related occupations or uses. This definition shall also include any taxicab (or other light-duty vehicle-for-hire) owned by any individual or business.
 
 
 526
 (5) All other terms used in this section that are defined in Part 51, Appendix N, are used herein with meanings so defined.
 
 
 527
 (b) This section is applicable within the Virginia portion of the National Capital Interstate AQCR.
 
 
 528
 (c) The Commonwealth of Virginia shall establish a retrofit program to ensure that on or before May 31, 1977, all light-duty fleet vehicles of model years 1971 through 1975 and medium-duty vehicles of model years 1971 through 1975 which are registered in the area specified in paragraph (b) of this section and are able to operate on 91 RON gasoline, are equipped with an appropriate oxidizing catalyst retrofit device or other device, as approved by the Administrator, that will reduce exhaust emissions of hydrocarbons and carbon monoxide to the same extent as an oxidizing catalyst retrofit device. No later than April 1, 1974, the Commonwealth of Virginia shall submit to the Administrator a detailed compliance schedule showing the steps it will take to establish and enforce a retrofit program pursuant to this section including the text of statutory proposals, regulations, and enforcement procedures that the Commonwealth proposes for adoption. The compliance schedule shall also include a date by which the Commonwealth shall evaluate and approve devices for use in this program. Such date shall be no later than January 1, 1975.
 
 
 529
 (d) No later than September 1, 1974, the Commonwealth shall submit legally adopted regulations to the Administrator establishing such a program. The regulation shall include:
 
 
 530
 (1) Designation of an agency responsible for evaluating and approving devices for use on vehicles subject to this section.
 
 
 531
 (2) Designation of an agency responsible for ensuring that the provisions of paragraph (d)(3) of this section are enforced.
 
 
 532
 (3) Provisions for beginning the installation of the retrofit devices by January 1, 1976, and completing the installation of the devices on all vehicles subject to this section no later than May 31, 1977.
 
 
 533
 (4) A provision that starting no later than May 31, 1977, no vehicle for which retrofit is required under this section shall pass the annual emission test provided for by §§ 52.2423 and 52.2441 unless it has been first equipped with an approved oxidizing catalyst device, or other device approved pursuant to this section, which the test has shown to be installed and operating correctly. The regulations shall include test procedures and failure criteria for implementing this provision.
 
 
 534
 (5) Methods and procedures for ensuring that those installing the retrofit devices have the training and ability to perform the needed tasks satisfactorily and have an adequate supply of retrofit components.
 
 
 535
 (6) Provision (apart from the requirements of any general program for periodic inspection and maintenance of vehicles) for emissions testing at the time of device installation or some other positive assurance that the device is installed and operating correctly.
 
 
 536
 (e) After May 31, 1977, the Commonwealth shall not register or allow to operate on its streets or highways any vehicle that does not comply with the applicable standards and procedures adopted pursuant to paragraph (d) of this section.
 
 
 537
 (f) After May 31, 1977, no owner of a vehicle subject to this section shall operate or allow the operation of any such vehicle that does not comply with the applicable standards and procedures implementing this section.
 
 
 538
 (g) Any vehicle which is manufactured equipped with an oxidizing catalyst, or which is certified to meet the original 1975 light-duty vehicle emission standards set forth in section 202(b)(1)(A) of the Clean Air Act of 1970 (without regard to any suspension of such standards), shall be exempt from the requirements of this section.
 
 
 539
 S 52.2447 Vacuum spark advance disconnect retrofit.
 
 
 540
 (a) Definitions:
 
 
 541
 (1) "Vacuum spark advance disconnect retrofit" means a device or system installed on a motor vehicle that prevents the ignition vacuum advance from operating either when the vehicle's transmission is in the lower gears, or when the vehicle is traveling below a predetermined speed so as to achieve reduction in exhaust emissions of hydrocarbon and carbon monoxide from 1967 and earlier light-duty vehicles of at least 25 and 9 percent, respectively.
 
 
 542
 (2) "Light-duty vehicle" means a gasoline-powered motor vehicle rated at 6,000 lb gross vehicle weight (GVW) or less.
 
 
 543
 (3) All other terms used in this section that are defined in Part 51, Appendix N, are used herein with meanings so defined.
 
 
 544
 (b) This section is applicable within the Virginia portion of the National Capital Interstate AQCR.
 
 
 545
 (c) The Commonwealth of Virginia shall establish a retrofit program to ensure that on or before January 1, 1976, all light-duty vehicles of model years prior to 1968 registered in the area specified in paragraph (b) of this section are equipped with an appropriate vacuum spark advance disconnect retrofit device or other device, as approved by the Administrator, that will reduce exhaust emissions of hydrocarbons and carbon monoxide to the same extent as a vacuum spark advance disconnect retrofit. No later than February 1, 1974, the Commonwealth of Virginia shall submit to the Administrator a detailed compliance schedule showing the steps it will take to establish and enforce a retrofit program pursuant to this section including the text of statutory proposals, regulations, and enforcement procedures that the Commonwealth proposes for adoption. The compliance schedule shall also include a date by which the Commonwealth shall evaluate and approve devices for use in this program. Such date shall be no later than September 30, 1974.
 
 
 546
 (d) No later than April 1, 1974, the Commonwealth shall submit legally adopted regulations to the Administrator establishing such a program. The regulations shall include:
 
 
 547
 (1) Designation of an agency responsible for evaluating and approving devices for use on vehicles subject to this section.
 
 
 548
 (2) Designation of an agency responsible for ensuring that the provisions of paragraph (d)(3) of this section are enforced.
 
 
 549
 (3) Provisions for beginning the installation of the retrofit devices by January 1, 1975, and completing the installation of the devices on all vehicles subject to this section no later than January 1, 1976.
 
 
 550
 (4) A provision that starting no later than January 1, 1976, no vehicle for which retrofit is required under this section shall pass the annual emission tests provided for by § 52.2423 unless it has been first equipped with an approved vaccum spark advance disconnect retrofit device, or other device approved pursuant to this section, which the test has shown to be installed and operating correctly. The regulations shall include test procedures and failure criteria for implementing this provision.
 
 
 551
 (5) Methods and procedures for ensuring that those installing the retrofit devices have the training and ability to perform the needed tasks satisfactorily and have an adequate supply of retrofit components.
 
 
 552
 (6) Provision (apart from the requirements of any general program for periodic inspection and maintenance of vehicles) for emissions testing at the time of device installation, or some other positive assurance that the device is installed and operating correctly.
 
 
 553
 (e) After January 1, 1976, the Commonwealth shall not register or allow to operate on its streets or highways any light-duty vehicle that does not comply with the applicable standards and procedures adopted pursuant to paragraph (d) of this section.
 
 
 554
 (f) After January 1, 1976, no owner of a vehicle subject to this section shall operate or allow the operation of any such vehicle that does not comply with the applicable standards and procedures implementing this section.
 
 
 555
 (g) The Commonwealth may exempt any class or category of vehicles from this section which the Commonwealth finds is rarely used on public streets and highways (such as classic or antique vehicles) or for which the Commonwealth demonstrates to the Administrator that vacuum spark advance disconnect devices or other devices approved pursuant to this section are not commercially available.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 294(d)
 
 
 [1]
 The National Capital Interstate Air Quality Control Region consists of Montgomery and Prince George Counties in Maryland; Arlington, Fairfax, Loudoun and Prince William Counties, and the cities of Alexandria, Fairfax and Falls Church in Virginia; and the District of Columbia
 
 
 [2]
 Unless otherwise indicated, the term "state" includes the District of Columbia. See 42 U.S.C. § 1857h(d)
 
 
 [3]
 See 38 Fed.Reg. 30626-27 (Nov. 6, 1973) for a more extensive discussion of these developments
 
 
 [4]
 Hydrocarbons, combined with sunlight and nitrogen dioxide, form oxidants. Thus separate figures for reduction in photochemical oxidants are not given. The relationship between reduction of hydrocarbons and reduction of oxidants is shown by the graph in Appendix J of 40 C.F.R. § 51
 
 
 [5]
 40 C.F.R. §§ 52.481, 52.1072(b), 52.2422(b)
 
 
 [6]
 42 U.S.C. § 1857h-5(b)(1) gives this court jurisdiction to entertain petitions for review of actions of the Administrator promulgating implementation plans covering any Region that includes the District of Columbia. Several of the instant petitions were initially filed in the Fourth Circuit and were transferred here pursuant to that court's order of June 4, 1974
 
 
 [7]
 The citation of three successive sections of 40 C.F.R. Part 52 denotes the respective provisions of the District of Columbia, Maryland and Virginia implementation plans
 
 
 [8]
 40 C.F.R. §§ 52.476(d)(3), 52.1080(d)(3), 52.2435(b)(3)
 
 
 [9]
 Id. §§ 52.476(e), 52.1080(e), 52.2435(c)
 
 
 [10]
 Id. §§ 52.476(f), 52.1080(f), 52.2435(d)
 
 
 [11]
 Id. §§ 52.486, 52.1085, 52.2437
 
 
 [12]
 EPA Brief at 32-33
 
 
 [13]
 40 C.F.R. §§ 52.487, 52.488, 52.1086, 52.1087, 52.2438, 52.2439. The rulemaking with respect to the regulations for control of vapor emissions during vehicle refueling has been reopened, 39 Fed.Reg. 21049 (June 18, 1974), and compliance dates have been deferred until the EPA approves a test procedure for certification of vapor recovery devices. 40 Fed.Reg. 1126-27 (Jan. 6, 1975). This court has ordered consolidation of four petitions for review of these regulations and deferred their consideration. Texaco, Inc. v. EPA, No. 74-1016 and consolidated cases, order entered December 30, 1974
 
 
 [14]
 40 C.F.R. §§ 52.493, 52.1103, 52.2443. Section 510 of Pub.L. 93-563, 88 Stat. 1822 (Dec. 31, 1974) prohibited the EPA from expending any funds to regulate parking facilities until June 30, 1975, and thus effectively stayed implementation of these regulations. The EPA subsequently suspended the parking management regulations indefinitely pending promulgation of amendments, 40 Fed.Reg. 2585-86 (Jan. 14, 1975), and has since extended that suspension in light of legislation pending before Congress on the subject, 40 Fed.Reg. 29713 (July 15, 1975). These regulations are presently before this court for review in Sears, Roebuck & Co. v. EPA, No. 73-2234 and consolidated cases
 
 
 [15]
 40 C.F.R. §§ 52.489, 52.1088, 52.2440
 16 U.S.Const., art. IV, Sec. 4.
 
 
 [17]
 Direct Federal enforcement and massive, duplicative Federal programs aimed at vehicles on an individual basis were not the means contemplated by the Act to solve these problems. It is clearly necessary that implementation of transportation control plans be carried out at the State and local level. The Chairman of the House Committee that reported out the amendments to the Act described their purpose as follows:
 If we left it all to the Federal Government, we would have about everybody on the payroll of the United States. We know this is not practical. Therefore, the Federal Government sets the standards, we tell the States what they must do and what standards they must meet. These standards must be put into effect by the communities and the States, and we expect them to have the means to do the actual enforcing.
 Equally clear, however, is that the amendments of 1970 were designed to cure deficiencies that had resulted from total reliance upon state and local action to solve what was increasingly recognized as a national health problem. The regulations now being promulgated will provide the necessary assurance that such state and local action will be forthcoming.
 
 
 [38]
 Fed.Reg. 30633 (Nov. 6, 1973)
 
 
 [18]
 See 172 U.S.App.D.C. ---, 521 F.2d 983, Infra
 
 
 [19]
 The Administrator has stated to this court that these powers to compel state compliance with his directives will only be used as a last resort and that he will rely primarily on cooperative efforts
 The Administrator does not intend to seek criminal penalties against a state legislature or governor pursuant to section 113(c) of the Clean Air Act . . . . His first approach will be to obtain compliance by means of administrative orders pursuant to section 113(a)(1) . . . and administrative conferences pursuant section 113(a)(4) . . . .
 But if moral suasion should fail, it is clear that the Administrator has an adequate judicial remedy.
 EPA Br. at 23-24. See also the Preamble to the transportation control plans:
 Under section 113(a)(1) and (2) of the Act, the Administrator is authorized to issue orders and to bring civil actions or seek penalties. Although the legal authority to enforce these plans is clear, the primary effort as is true for all implementation plans will be directed toward working with the States both to develop and to implement effective strategies. This effort should continue even after these measures have been promulgated, so that all affected states eventually assume voluntarily the direct responsibility for enforcement of the plans.
 
 
 [38]
 Fed.Reg. 30633 (Nov. 6, 1973). We note, however, that the EPA has recently threatened to commence enforcement action against the District of Columbia government for failing to adopt an inspection program. See Exhibit A to the D.C. Reply Brief. Thus we believe that petitioners' claims are ripe for review
 
 
 [20]
 We note that section 110(a)(2)(F)(i) requires state-submitted plans to provide "necessary assurances that the State will have adequate personnel, funding, and authority to carry out such implementation plans" before they may be approved by the Administrator. However, the consequence of failing to provide such "assurances" is that the Administrator must promulgate a plan for that state under section 110(c). It does not follow that Congress believed that these "assurances" would be a necessary part of the Administrator's regulations. See NRDC v. EPA, 478 F.2d 875, 883-84 (1st Cir. 1973):
 (G)iven the mechanics of state-federal relations, it is difficult to imagine what sort of guarantee the current Rhode Island legislature could give the EPA to ensure that adequate resources would be devoted to the Plan. . . . Such assurances might have a symbolic effect; however, they would have little more, since a governor, or even a present session cannot make commitments on behalf of their successors, nor would such binding commitments seem to be enforceable.
 
 
 [21]
 With respect to the bicycle lane regulations, the requirements that the states submit "comprehensive studies" of the need for and feasibility of the program and that they submit legally adopted regulations exceed the Administrator's authority under the Clean Air Act. The directive that the states shall require all operators of parking facilities to provide bicycle storage areas must also be invalidated as in excess of the Administrator's authority. Of course, this latter defect could be corrected simply by addressing his orders directly to the operators of such facilities
 
 
 [22]
 See also S.Rep.No.91-1196, 91st Cong., 2d Sess. 14 (Sept. 17, 1970) ("The States would be expected to act to improve used vehicle performance."); 116 Cong.Rec. 32903 (Sept. 21, 1970) (Sen. Muskie) ("In Title I of this act we have written a national deadline for the purpose of implementing applicable ambient air quality standards. This is going to require every State Governor and the mayor of every city in this country to impose strict controls on the use of automobiles before the new car is a clean one.")
 
 
 [23]
 The Supreme Court has recently scheduled reargument in a case involving the application of the Fair Labor Standards Act to all non-supervisory state and municipal employees, including police and firemen. National League of Cities v. Brennan, (D.D.C., Dec. 31, 1974, Civ.No. 74-1812) (three-judge court), Probable jurisdiction noted, 420 U.S. 906, 95 S.Ct. 823, 42 L.Ed.2d 835, Reargument scheduled, 421 U.S. 986, 95 S.Ct. 1988, 44 L.Ed.2d 475 (1975)
 
 
 [24]
 Petitioners also challenge the constitutionality of section 113(c) insofar as it permits the imposition of penalties upon a state or its officials for failing to comply with the provisions of an EPA-promulgated implementation plan. However, to the extent that the state is subject to federal regulation under the commerce power, it will also be subject to the penalties provided for violation of those regulations. Parden v. Terminal Railway, 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964); United States v. California, 297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567 (1936). The Eleventh Amendment is of course no bar to enforcement actions brought by the federal government. It is clear that local governmental units may be required to comply with valid federal commerce regulations even when such action is inconsistent with or contrary to state policies. First Iowa Hydro-Electric Cooperative v. FPC, 328 U.S. 152, 168-72, 66 S.Ct. 906, 90 L.Ed. 1143 (1946); Washington Dept. of Game v. FPC, 207 F.2d 391, 396 (9th Cir. 1953), Cert. denied, 347 U.S. 936, 74 S.Ct. 626, 98 L.Ed. 1087 (1954). However, the federal government will be able to order the subdivisions of the states to enact, administer and enforce federal regulatory programs only to the extent that it possesses the same power over the states
 
 
 [25]
 By building and maintaining roads and highways, by licensing vehicles and operators, by providing a system of traffic laws, and in many other ways, government has encouraged the growth of automobile use to its present levels. There is nothing inevitable about such a choice. Governments could equally well have chosen to discharge their basic function of maintaining a transportation system in ways that would have discouraged the use of single-passenger automobiles, and encouraged the use of mass transit. But often they have not
 
 
 [38]
 Fed.Reg. 30632 (Nov. 6, 1973). If responsibility for correcting air pollution problems arising from the operation of a regional system of streets and highways is to be assigned on the basis of the extent to which each jurisdiction has encouraged the use of automobiles, we would note that the federal government with its massive appropriations for highway construction bears a significantly higher portion of the blame than the Administrator's statements acknowledge
 
 
 [26]
 The federal government traditionally obtains state cooperation and participation in federal regulatory programs by offering the states a sufficiently attractive incentive or by threatening to withdraw a federal benefit they are presently receiving. A recent example of both approaches is the Emergency Highway Energy Conservation Act, Pub.L. 93-239, 87 Stat. 1046 (Jan. 2, 1974). Section 2 of that Act conditions the receipt of federal highway aid funds upon each state establishing a 55 miles per hour maximum speed limit upon the public highways within its jurisdiction. Section 3 made available to the states 90 percent federal funding for approved demonstration projects designed to encourage the use of car pools in urban areas
 
 
 [27]
 We do not agree with the statement in Pennsylvania v. EPA, 500 F.2d 246 (3d Cir. 1974), that direct federal enforcement of the retrofit and inspection programs would not "represent less of an intrusion upon state sovereignty." Id. at 263. The principle at work here is not that the states have an interest in keeping the federal government from regulating vehicles owned by their citizens but rather that they are to be protected from federal compulsion to exercise state governmental functions in an area where they choose to remain inactive. Since the federal government acts under its commerce power when it enforces its own regulations against vehicle owners, direct federal regulation by definition involves no intrusion on state sovereignty whatsoever
 
 
 [28]
 It must be emphasized that, in order to be effective, each VMT (vehicle miles traveled) control measure proposed or adopted by the District of Columbia must be reflected by identical or equivalent measures in the neighboring jurisdictions of Maryland and Virginia for their portions of the National Capital Interstate Region
 
 
 [38]
 Fed.Reg. 20758 (Aug. 2, 1973). See also 42 U.S.C. §§ 1857c-1, 1857c-2
 
 
 [29]
 5 U.S.C. § 706(2)(A)
 
 
 [30]
 38 Fed.Reg. 33709 (Dec. 6, 1973)
 
 
 [31]
 Id. at 33708
 
 
 [32]
 EPA White Paper on Transportation Controls 5-6 (August 1973), Jt.App. at 329-30
 
 
 [33]
 Even if we had held that the Administrator possesses power to compel the states to evaluate retrofit devices, we would have grave doubts about the reasonableness of a regulation which permitted each jurisdiction to conduct independent evaluations and possibly adopt different retrofit devices for installation in each portion of the National Capital Region
 
 
 [34]
 The Philadelphia study consisted of questionnaires distributed at random to 500 persons in parked motor vehicles in the city's central business district. Of the 220 questionnaires which were returned, 33 percent indicated they owned bicycles and 38 percent of that group said they were likely to use bicycles for commuting if safe lanes and secure storage facilities were provided. Of the 67 percent of the sample that did not own bicycles, 17 percent said they would buy and use them for commuting if such facilities were available. No comparison was made of the likely commuting distances in Philadelphia and the Washington area